AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

**ORIGINAL FILED**

SEP 0 1 2015

WILLIAM T. WALSH, CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| HAROLD MILLER, | ) | |
| aka KILLER CLOWN, aka CUZ, aka CUZZO, | ) | 15-mj-5545 (KMW) |
| aka HAL, aka HOWIE | ) | |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 2014 through August 2015___ in the county of ___Camden___ in the

___ District of ___New Jersey___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 846 | Conspiracy to distribute and possess with intent to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, and a quantity of mixture and substance containing a detectable amount of heroin, contrary to 21 USC Section 841(a)(1) and (b)(1)(A) and (b) (1)(C), in violation of 21 USC Section 846. |
| 21 U.S.C. Sections 841(a) and 841(b)(1)(A) and (C) | |

For further description see Attachment A

This criminal complaint is based on these facts:

See Attachment B, Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael Bailey, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___09/01/2015___

_____
*Judge's signature*

City and state: ___Camden, New Jersey___    Hon. Karen M. Williams, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**COUNT ONE**

From in or about May 2014 through in or about August 2015, in Camden County, in the District of New Jersey and elsewhere, defendants

HAROLD MILLER, aka "KILLER CLOWN," aka "CUZ,"
aka "CUZZO," aka "HAL," aka "HOWIE,"

RODNEY WALL, aka "BOO," aka "GOTTI," aka "BOO GOTTI,"

RASHEED WISE, aka "SHEED," aka "NOODLES,"

DAVID WILKERSON, aka "DAVE," aka "WILKY,"

TYNELL MANTEZ, aka "GEEZ," and

NATHANIEL PLUMMER, aka "NATE," aka "SHUG,"

did knowingly and intentionally conspire and agree with each other and with others to distribute and possess with intent to distribute controlled substances, specifically:  (1) 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and (2) a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

          In violation of Title 21, United States Code, Section 846.

CONTENTS APPROVED

UNITED STATES ATTORNEY

BY: _____

NELSON S.T. THAYER, JR.
Assistant United States Attorney

Date: _____

**ATTACHMENT B**

AFFIDAVIT OF PROBABLE CAUSE

I, Michael Bailey, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

1.    I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Philadelphia Division, South Jersey Violent Offender and Gang Task Force ("SJVOGTF") in Cherry Hill, New Jersey.  Prior to being assigned to the SJVOGTF, I was assigned to the FBI Omaha Division, Omaha, Nebraska.  I have been an FBI Special Agent since July, 2008.  I have received training in investigating violations of federal statutes from the FBI Academy in Quantico, Virginia.  As a Special Agent, I have also received specialized training in telecommunications exploitation.  I have conducted physical and electronic surveillance, debriefed confidential human sources and participated in numerous arrests and in the execution of search warrants.  I have participated in numerous narcotics and gang

1

investigations and debriefed or participated in the debriefings of numerous defendants, informants, and witnesses who had personal knowledge of narcotics trafficking and gang organizations. I have participated in all aspects of narcotics/gang investigations including conducting surveillance, analyzing subpoenaed toll information, and analyzing court-ordered pen registers and trap and trace intercepts. I have also assisted in investigations involving the interception of wire and electronic communications. Based on my training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled dangerous substances ("CDS"). I am aware that drug traffickers commonly use cellular telephones, including voice mail, push-to-talk ("PTT"), and text messages in furtherance of their drug trafficking activities to maintain contact with their suppliers, couriers, customers, and others involved in the transportation, storage, and marketing of CDS, and to discuss their plans to obtain, use, store and discard firearms associated with their narcotics trafficking activities.

3. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection by law enforcement. I am familiar with the terminology, "lingo," and code words used in the drug trafficking trade, especially among

street-level distributors. I am aware that those involved in illegal narcotics trafficking operations often list their telephones and cellular telephones in others' names or purchase pre-paid cellular telephones that do not require proof of identification in order to conceal their identity and illegal purposes from law enforcement. Based on my training and experience, I am also aware that those involved in illegal narcotics trafficking organizations frequently obtain, carry and use firearms to protect their drug trafficking organization's ("DTO") objectives and often commit acts of violence in order to protect and further their drug trafficking activities.

4. I submit this Affidavit in support of a Criminal Complaint charging HAROLD MILLER, a.k.a. "KILLER CLOWN," a.k.a. "CUZ," a.k.a. "CUZZO," a.k.a. "HAL," a.k.a. "HOWIE" (**"MILLER"**); RODNEY WALL a.k.a. "BOO," a.k.a. "GOTTI," a.k.a. "BOO GOTTI" (**"WALL"**); RASHEED WISE, a.k.a. "SHEED," a.k.a. "NOODLES" (**"WISE"**); DAVID WILKERSON, a.k.a. "DAVE," a.k.a. "WILKY" (**"WILKERSON"**); TYNELL MANTEZ, a.k.a. "GEEZ" (**"MANTEZ"**); and NATHANIEL PLUMMER, a.k.a. "BABY BOY," a.k.a. "NATE," a.k.a. "SHUG" (**"PLUMMER"**) with conspiracy to distribute cocaine base ("crack cocaine") and heroin contrary to Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) and (b)(1)(C), in violation of Title 21, United States Code, Section 846.

## Summary of the Investigation

**5.** Since approximately December 2013, the SJVOGTF has conducted an investigation into the drug trafficking activities of MILLER, PLUMMER and their associates. During the investigation, the SJVOGTF utilized numerous techniques including, but not limited to: confidential sources of information,[1] database and public records queries, consensually-recorded conversations, controlled drug purchases, video "pole" camera surveillance, physical and electronic surveillance, court-authorized telephone and vehicle tracking warrants, and court-authorized interception of wire and electronic communications.

**6.** In sum, this investigation has determined that MILLER leads a drug trafficking organization ("DTO") operating an open-air drug market, commonly referred to as a "drug set" or "set," on the 500 block of Pfeiffer Street in Camden, New Jersey (the "Pfeiffer Street drug set"). The DTO is responsible for the distribution of crack cocaine and heroin, primarily via hand-to-hand drug transactions with customers who arrive on the Pfeiffer

---

[1]      Information provided by confidential sources during this investigation was routinely corroborated through other law enforcement sources, telephone analysis, court-authorized interception of wire and electronic communications and physical surveillance. Information provided by confidential sources during this investigation has proven reliable. All confidential sources, with the exception of one, received monetary payments from investigators.

4

Street drug set on foot or by vehicle, and through transactions arranged via cellular telephone.

7.   MILLER, WALL, WISE, WILKERSON, MANTEZ, PLUMMER, K.B.-1 and V.R.[2] were members of the DTO during the conspiracy, the purpose of which was to profit from the distribution of controlled dangerous substances, namely crack cocaine and heroin, in the city of Camden.  The investigation revealed that MILLER leads the DTO and "owns" the Pfeiffer Street drug set, meaning that he has or shares ultimate control over the operation of the drug set, including its supply, packaging and pricing; payment and management of set workers; control of profits; and security from law enforcement and rival drug dealers.  The investigation, including physical, video and electronic surveillance, revealed that MILLER typically spends no more than a few hours of each weekday at a work-place, then devotes the balance of the day to overseeing his drug trafficking activities and the operation of the Pfeiffer Street drug set, such as traveling to the drug set to collect proceeds from the set workers and ensure that set workers are present to serve customers.  WALL and WISE manage the drug set's operation, to include supplying the set workers with crack cocaine and heroin; ensuring the presence of set workers on the drug set; and collecting the proceeds from the

---

[2]    K.B.-1 and V.R. are set workers named as co-conspirators but not as defendants herein.  K.B.-1 is designated as "-1" because there is another co-conspirator (also not named as a defendant herein) with the same initials of "K.B.," and who is therefore designated as "K.B.-2."

5

drug sales from the set workers and turning those proceeds over to MILLER.  Set workers such as WILKERSON, MANTEZ, K.B.-1, V.R. and others typically station themselves in front of residences on the 500 block of Pfeiffer Street and serve customers as they arrive.  The set workers typically earn their money by keeping a portion of their CDS sales' proceeds, or a certain amount of CDS, which they could sell on their own, and whose proceeds they could keep.  In order to be permitted to sell CDS on the drug set, both set workers and set managers are required to pay MILLER a portion of their proceeds for his permission to do so. The investigation revealed numerous instances in which MILLER collected proceeds from, for example, WALL and WILKERSON, in his role as set owner.

8.    During the investigation, multiple video "pole cameras" were installed to surveil the daily hand-to-hand narcotics sales and controlled purchases, as well as the presence, activities and interactions of MILLER, WALL, WISE, WILKERSON, MANTEZ, K.B.-1, V.R. and PLUMMER on the Pfeiffer Street drug set and at other stash and/or packaging locations.  In addition, GPS tracking devices were installed on two vehicles used by MILLER, a 2001 green-colored Honda Civic, New Jersey registration B92-DJW ("the Civic") and a gold-colored 2000 Chrysler 300, New Jersey Registration F29-CAC ("the Chrysler 300").  GPS tracking devices were also installed on a black 2012 Dodge Durango, New Jersey

registration L58-BXJ ("the Durango") used by PLUMMER.[3]

Investigators also consistently complemented and supplemented

_____

[3]    On July 24, 2014, the Hon. Karen M. Williams, United States
Magistrate Judge, United States District Court for the District of New
Jersey, Camden, New Jersey, approved a Tracking Warrant, 14-mj-5544
(KMW), authorizing the installation and use of a tracking device on
the Civic for a period of 45 days.  The tracking of MILLER's vehicle
pursuant to the Court's authorization began on or about July 25, 2014.

     On September 5, 2014, Judge Williams approved a Tracking Warrant,
14-mj-5548 (KMW), authorizing the installation and use of a tracking
device on the Civic for a period of 45 days.  The tracking of MILLER's
vehicle pursuant to the Court's authorization began on or about
September 5, 2014.

     On October 17, 2014, Judge Williams approved a Tracking Warrant,
14-mj-5569 (KMW), authorizing the installation and use of a tracking
device on the Civic for a period of 45 days.  The tracking of MILLER's
vehicle pursuant to the Court's authorization began on or about
October 17, 2014.

     On December 1, 2014, Judge Williams approved a Tracking Warrant,
14-mj-5584 (KMW), authorizing the installation and use of a tracking
device on the Civic for a period of 45 days.  The tracking of MILLER's
vehicle pursuant to the Court's authorization began on or about
December 1, 2014.

     On January 15, 2015, the Hon. Joel Schneider, United States
Magistrate Judge, United States District Court for the District of New
Jersey, Camden, New Jersey, approved a Tracking Warrant, 15-MJ-2007
(JS) authorizing the installation and use of a tracking device on the
Civic for a period of 45 days.  The tracking of MILLER's vehicle
pursuant to the Court's authorization began on or about January 15,
2015.

     On February 27, 2015, Judge Williams approved a Tracking Warrant,
15-mj-5513 (KMW), authorizing the installation and use of a tracking
device on the Civic for a period of 45 days.  The tracking of MILLER's
vehicle pursuant to the Court's authorization began on or about
February 27, 2015 and terminated on March 18, 2015 when it was removed
after the vehicle ceased to be driven.

     On May 28, 2015, Judge Williams approved a Tracking Warrant, 15-
mj-5531 (KMW), authorizing the installation and use of a tracking
device on the Chrysler 300 for a period of 45 days.  The tracking of
MILLER's vehicle pursuant to the Court's authorization began on or
about May 28, 2015.

the video and electronic surveillance with physical surveillance.

9.   Between June 2014 and May 2015, utilizing a confidential source ("CS-4"), the SJVOGTF conducted approximately 24 controlled purchases of crack cocaine and heroin at the Pfeiffer Street drug set from DTO members WALL, WISE, WILKERSON and K.B.-1.[4]

10.  In addition, beginning in March 2015, the Hon. Joseph E. Irenas, Senior United States District Judge, District of New Jersey, authorized the interception of wire and electronic

---

On July 10, 2015, Judge Williams approved a Tracking Warrant, 15-mj-5539 (KMW), authorizing the installation and use of a tracking device on the Chrysler 300 for a period of 45 days.  The tracking of MILLER's vehicle pursuant to the Court's authorization began on or about July 15, 2015.

On April 1, 2015, Judge Williams approved a Tracking Warrant, 15-mj-5522 (KMW), authorizing the installation and use of a tracking device on the on the Durango for a period of 45 days.  The tracking of PLUMMER's vehicle pursuant to the Court's authorization began on or about April 2, 2015.

On August 14, 2015, Judge Schneider approved a Tracking Warrant, 15-mj-2047 (JS), authorizing the installation and use of a tracking device on the on the Durango for a period of 45 days.  The tracking of PLUMMER's vehicle pursuant to the Court's authorization began on or about August 14, 2015, and remains ongoing the time of this Affidavit.

[4]   Immediately prior to and following each controlled purchase, the CS' vehicle and person were searched for CDS, U.S. currency and contraband; in every case, the pre/post searches revealed none.  Prior to each controlled purchase, the CS was equipped with a recording device, and immediately following the controlled purchase, the recording device was retrieved by the investigators.  The controlled purchases were surveilled and audio and video recorded.  All CDS obtained during the controlled purchases field-tested positive for the suspected substance.

communications of numerous cellular telephones utilized by WALL, WISE, MILLER and PLUMMER to conduct the drug trafficking business of the Pfeiffer Street drug set during the conspiracy.[5]

_____

[5]  On March 4, 2015, the Honorable Joseph E. Irenas, Senior United States District Court Judge, District Court for the District of New Jersey, Camden, signed an Order, Misc. No. 15-0029, authorizing, for a 30-day period, the interception of wire and electronic communications over (856) 254-9434, a cellular telephone utilized by Rodney WALL ("WALL FACILITY 1"). Interception over WALL FACILITY 1 pursuant to Judge Irenas' March 4, 2015 Order began on or about March 4, 2015 and terminated on March 30, 2015.

On April 3, 2015, Judge Irenas signed an Order, Misc. No. 15-0034, authorizing the interception of wire communications occurring over (856) 504-0034, another cellular telephone utilized by Rodney WALL ("WALL FACILITY 2") for a 30-day period. Interception pursuant to Judge Irenas' April 3, 2015 Order began on April 3, 2015 and terminated on May 2, 2015.

On May 1, 2015, Judge Irenas signed an Order, Misc. No. 15-0034, authorizing the extension of the interception of wire communications occurring over WALL FACILITY 2 for an additional 30-day period. Interception pursuant to Judge Irenas' May 1, 2015 Order began on May 1, 2015 and terminated on May 31, 2015.

On May 1, 2015, Judge Irenas signed an Order, Misc. No. 15-0036, authorizing the interception of wire communications occurring over (856) 676-8673, a cellular telephone utilized by Rasheed WISE ("WISE FACILITY 1"), for a 30-day period.  Interception pursuant to Judge Irenas' May 1, 2015 Order began on May 2, 2015, and terminated on June 1, 2015.

On May 14, 2015 Judge Irenas signed an order, Misc. No. 15-0038, authorizing the interception of wire and electronic communications occurring over (856) 602-2143, a cellular telephone utilized by Harold MILLER ("MILLER FACILITY 1"), for a 30-day period.  Interception pursuant to Judge Irenas' May 14, 2015 Order began on May 15, 2015 and terminated on June 12, 2015.

On June 12, 2015 Judge Irenas signed an order, Misc. No. 15-0038, authorizing the continued interception of wire and electronic communications occurring over MILLER FACILITY 1 for an additional 30-

11.  During the course of the investigation, the DTO sold crack cocaine packaged in pink-colored and yellow-colored heat-sealed bags for $10 per bag on the Pfeiffer Street drug set.  The DTO sold ten bags of crack cocaine for one hundred dollars, and on occasion, set workers would provide regular customers with a few additional free bags, referred to as a "bonus."  For example, a confidential source who purchased $500 worth of crack cocaine multiple times from the DTO, often received an extra two to ten bags at no cost.  The investigation further determined that the Pfeiffer Street drug set operates seven days a week.

12.  Through the above-described investigative techniques, including monitoring of intercepted wire and electronic communications, pole camera surveillance and controlled purchases, the investigation has determined that the drug set

---

day period. Interception pursuant to Judge Irenas' June 12, 2015 Order began on June 12, 2015 and terminated on July 8, 2015.

On July 2, 2015 Judge Irenas signed an order, Misc. No. 15-0041, authorizing the interception of wire and electronic communications occurring over (856) 236-5026, a cellular telephone utilized by Nathaniel PLUMMER (PLUMMER FACILITY 1), for a 30-day period. Interception pursuant to Judge Irenas' July 2, 2015 Order began on July 6, 2015 and terminated on August 5, 2015.

On August 4, 2015 Judge Irenas signed an order, Misc. No. 15-0041, authorizing the continued interception of wire and electronic communications occurring over PLUMMER FACILITY 1 for an additional 30-day period. Interception pursuant to Judge Irenas' August 4, 2015 Order began on August 5, 2015 and remains ongoing at the time of this Affidavit.

was supplied with quantities of crack cocaine on a daily to

weekly basis.  Based on the duration of the investigation and

the quantity of crack cocaine being sold on the Pfeiffer Street

drug set and directly to customers at other locations, the

members of this conspiracy have sold, conservatively, in excess

of 280 grams of crack cocaine.

<u>**Background of Defendants**</u>

13.  **HAROLD MILLER** (Date of Birth ("DOB"): June 25, 1977) is

believed by law enforcement to reside at 605 White Oak Lane in

Mantua Township, New Jersey.  A check of the New Jersey DMV

database revealed a New Jersey Driver's license number

M43583157306772 for HAROLD MILLER at 47 Magnolia Street,

Westville, New Jersey.  A further check revealed a 2001 green

colored Honda Civic ("the Civic"), New Jersey registration B92-

DJW, registered to MILLER.  During this investigation, I believe

that MILLER has utilized and/or is utilizing at least four

cellular telephone numbers.  MILLER has utilized cellular

telephone number (856) 689-0179, a Verizon Wireless-assigned

number subscribed to by HAROLD MILLER, 47 Magnolia Street,

Westville, New Jersey; cellular telephone number (856) 426-4380,

a Tracfone-assigned number subscribed to by 260642119232085,

Haddon Township, New Jersey; cellular telephone number (856)

602-2143 ("MILLER FACILITY 1"), a Tracfone/T-Mobile Simple-

assigned number subscribed to by "N/A," with an address of "N/A;" and more recently, cellular telephone number (856) 379-8367, a T-Mobile-assigned number."[6]  A National Crime Information Center ("NCIC") database search revealed that MILLER has a 1996 felony conviction in Camden County, New Jersey Superior Court for Possession of a Controlled Dangerous Substance with the Intent to Distribute within 1000 feet of School Property, for which he was sentenced to four years' imprisonment; and a 2001 conviction in the U.S. District Court for the District of New Jersey for unlawfully possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), for which he was sentenced to 37 months' imprisonment.  While on supervised release pursuant to the latter conviction, MILLER was arrested by the Camden City Police Department and charged with aggravated assault and terroristic threats after a woman approached a police officer conducting a motor vehicle stop of MILLER and stated that MILLER had attempted to rape her, and that he was in possession of a handgun.  Pursuant to a supervised release violation petition based on that new arrest, MILLER subsequently pleaded

---

[6] In this Affidavit, telephone number (856) 689-0179 is referred to as "(856) 689-0179 (MILLER);" telephone number (856) 426-4380 is referred to as "(856) 426-4380 (MILLER);" and telephone number (856) 379-8367 is referred to as "(856) 379-8367 (MILLER)."  Telephone number (856) 602-2143, intercepted pursuant to Judge Irenas' May 14, 2015 Order, is referred to as "MILLER FACILITY 1."

guilty to "committing another crime" and was sentenced to
fourteen months' imprisonment.

14.  **RODNEY WALL** (DOB: August 6, 1986) resides in Camden.  WALL
has resided at 1220 Walnut Street in Camden, and more recently
resides at 2662 Berkley Street in Camden.  A check of the New
Jersey DMV database revealed a suspended New Jersey Driver's
license number W02886626508862 for RODNEY WALL at 1220 Walnut
Street, Camden.  WALL has utilized cellular telephone number
(856) 254-9434, subscribed to by "JOHN SMITH," PO Box 8367,
Cherry Hill, New Jersey and issued by Metro PCS ("WALL FACILITY
1), and cellular telephone number (856) 504-4630, subscribed to
by "BOO GOTTI," with an address of 1220 Walnut Street, Camden,
NJ and issued by Metro PCS ("WALL FACILITY 2").  A further check
of this database revealed no vehicles registered to WALL.  Based
on analysis of databases available to law enforcement, WALL does
not have any known identifiable employment.  An NCIC search
reveals that WALL has a criminal history that includes: (1) a
November 11, 2004 arrest by the Camden City Police Department
that resulted in a felony conviction on July 5, 2005 for
distribution of heroin/cocaine for which he was sentenced to
four years' probation; (2) an April 1, 2009, arrest by the
Camden City Police Department that resulted in a felony
conviction on June 28, 2010 for distribution of heroin/cocaine,
for which he was sentenced to four years' imprisonment with an

eighteen month parole ineligibility stipulation to run concurrent to the two other sentences imposed on this date; (3) an April 29, 2009 arrest by the Camden City Police Department that resulted in a felony conviction on June 28, 2010 for distribution of heroin/cocaine for which he was sentenced to four years' imprisonment with an eighteen-month parole ineligibility stipulation to run concurrent to the two other sentences imposed on this date; and (4) a May 16, 2009 arrest by the Camden City Police Department that resulted in a felony conviction on June 28, 2010 for distribution of heroin/cocaine for which he was sentenced to four years' imprisonment with an eighteen-month parole ineligibility stipulation to run concurrent to the two other sentences imposed on this date.  It should be noted that although WALL has listed 1220 Walnut Street, Camden as his residence, a check of databases available to law enforcement revealed that WALL has extensive ties to the 500 block of Pfeiffer Street.  For example, on June 19, 2006, WALL was shot at 526 Pfeiffer Street, and between 2009 and 2014, WALL was arrested four times on the 500 block of Pfeiffer Street.

15.    **RASHEED WISE** (DOB: November 24, 1976) is believed to reside at 11 Dudley Street in Camden.  It is believed that WISE uses, or has used cellular telephone number (856) 676-8673 ("WISE

FACILITY 1")[7].  WISE FACILITY 1 is an AT&T-assigned number
subscribed to "SHEED SMITH," 530 Pfeiffer Street, Camden.  A
check of the New Jersey DMV database revealed a New Jersey
Driver's license number W46416420011762 for RASHEED WISE at 5309
Elvena Avenue, Merchantville, New Jersey.  A further check
revealed no vehicles registered to WISE.  An NCIC database
search reveals that WISE has a criminal history that includes:
(1) a March 10, 1997 arrest by the Camden City Police Department
that resulted in a felony conviction on May 21, 1997 for
manufacturing/ distributing CDS, for which he was sentenced to a
two-year term of probation supervision conditioned upon serving
25 days in the Camden County Correctional facility; (2) a
January 8, 2002 arrest by the Camden City Police Department that
resulted in a felony conviction on April 12, 2002 for
manufacturing/distributing CDS, for which he was sentenced to a
five-year term of probation supervision (WISE later violated the
terms of his probation and was re-sentenced on November 18, 2005
to a four-year New Jersey State Prison term); (3) a June 9, 2002
arrest by the Camden City Police Department that resulted in a
felony conviction on May, 9, 2003 for distributing
heroin/cocaine, for which he was sentenced to a five-year New
Jersey State Prison term, with two years' parole ineligibility;

---

[7]  As described in more detail below, on August 21, 2014, a CS made a
consensually recorded crack cocaine purchase from the Pfeiffer Street
drug set. During this recorded transaction, WISE gave (856) 676-8673
to the CS as his telephone number.

15

and (4) a June 20, 2005 arrest by the Camden City Police Department that resulted in a felony conviction on November 7, 2005 for distributing heroin/cocaine, for which he was sentenced to a three-year New Jersey State Prison term.  A check of social media postings reveals a photograph of WISE standing in front of a vehicle on the 500 block of Pfeiffer Street.

16.  **DAVID WILKERSON** (DOB: May 3, 1983) is believed to reside in Camden.  Based upon the investigation, it is believed that WILKERSON uses, or has used cellular telephone number (856) 426-0933 ("WILKERSON PHONE").  A check of the New Jersey DMV database revealed a New Jersey Driver's license number W43421566105831.  A further check revealed no vehicles registered to WILKERSON.  An NCIC database search reveals that WILKERSON has a criminal history that includes:  (1) an October 15, 2002 arrest by the Camden City Police that resulted in a felony conviction on February 4, 2003 for possession of CDS with intent to distribute within 1000 feet of school property, for which he was sentenced to three years' confinement; (2) a July 25, 2005 arrest by the Camden City Police that resulted in a felony conviction on August 4, 2006 for conspiracy to distribute heroin or cocaine, for which he was sentenced six months' confinement and five years' probation.  On October 19, 2007, his probation was revoked and he was resentenced to one year's confinement; (3) a December 22, 2005 arrest by the Deptford Police Department that

resulted in a felony conviction on January 9, 2009 for
conspiracy to distribute heroin or cocaine, for which he was
sentenced to six years' confinement; and (4) an August 29, 2007
arrest by the Camden City Police that resulted in a felony
conviction on June 19, 2008 for unlawful possession of a
handgun, for which he was sentenced to five years and 6 months'
confinement.

17.  **TYNELL MANTEZ** (DOB: August 23, 1976) is believed to reside
in Camden.  Based upon the investigation, it is believed that
MANTEZ uses, or has used cellular telephone number (856) 899-
8242 ("MANTEZ PHONE").  A check of the New Jersey DMV database
revealed a New Jersey Driver's license number M0484752640876 for
TYNELL MANTEZ, 517 Penn Street, Camden, New Jersey, 08102.  A
further check revealed no vehicles registered to MANTEZ.  An
NCIC database search reveals that MANTEZ has a criminal history
that includes: (1) a November 18, 2001 arrest by the Camden City
Police Department that resulted in a felony conviction on February
21, 2003 for aggravated assault, for which he was sentenced to
eighteen months' imprisonment; (2) an October 22, 2004 arrest by
the Collingswood Police Department that resulted in a felony
conviction on March 10, 2006 for burglary, for which he was
sentenced to four years' imprisonment; (3) an April 18, 2005
arrest by the Camden City Police Department that resulted in
felony convictions on March 10, 2006 for distributing

17

heroin/cocaine and unlawful possession of a handgun, for which he was sentenced to four years' imprisonment; (4) a January 15, 2009 arrest by the Camden City Police Department that resulted in felony convictions on March 12, 2010 for possession of a weapon by a felon and conspiracy to distribute heroin/cocaine, for which he was sentenced to seven years' imprisonment; and (5) a March 28, 2009 arrest by the Camden City Police Department that resulted in a felony conviction on March 12, 2010 for possession of CDS within 1000 feet of school property, for which he was sentenced to three years' imprisonment.

18. **NATHANIEL PLUMMER** (DOB: May 11, 1984) is believed by law enforcement to reside in the Millbridge Gardens Apartments in Gloucester City, New Jersey.  It is believed that PLUMMER has used telephone number (856) 993-4038 ("(856) 993-4038 (PLUMMER)"), a Sprint-assigned number subscribed to Luiz Saro, PO Box 54988, Irvine, California.[8]  As described in more detail below, the investigation has determined that PLUMMER currently uses telephone number (856) 236-5026 ("PLUMMER FACILITY 1").  Telephone number (856) 236-5026 is a T-Mobile-assigned number with IMSI number 310260951846878, subscribed to "N/A" with an

---

[8] Based on the investigation thus far, PLUMMER appears to have been the only user of PLUMMER PHONE 1.  Law enforcement has been able to determine that (856) 993-4038 was associated with PLUMMER through the use of surveillance, pen data register and interception of MILLER FACILITY 1.  Therefore, I believe that "Luiz Saro" is a fictitious subscriber name.

address of "N/A."  A check of the New Jersey DMV database
revealed a New Jersey Driver's license number P56575827905842 for
NATHANIEL PLUMMER at 676 Fairview Street, Camden.  A further
check of this database revealed no vehicles registered to
PLUMMER.  An NCIC database search reveals that PLUMMER has a
criminal history that includes: (1) a July 8, 2002 arrest by the
Camden City Police Department that resulted in a felony
conviction on March 3, 2003 for CDS on school property for which
he was sentenced to three years' imprisonment, with nine months'
parole ineligibility; (2) a July 15, 2005 arrest by the Camden
City Police Department that resulted in a felony conviction on
June 5, 2006 for conspiracy to distribute heroin and cocaine,
for which he was sentenced to five years' imprisonment, with 30
months' parole ineligibility; and (3) a September 21, 2010
arrest by the Camden City Police Department that resulted in a
felony conviction on January 9, 2012 for aggravated assault with
a weapon, for which he was sentenced to four years'
imprisonment.

### Defendants' and Co-conspirators' Drug Trafficking Activities in Furtherance of the DTO

19.  On or about June 12, 2014, utilizing CS-4, law enforcement
conducted a controlled purchase of crack cocaine from the
Pfeiffer Street drug set.  During the afternoon hours of this
day, CS-4 traveled to the Pfeiffer Street drug set, where pole

camera surveillance captured CS-4 arriving.  K.B.-1 arrived in a
gray-colored vehicle, approached CS-4's vehicle and sold CS-4
two bags of crack cocaine for $20.  This quantity of crack
cocaine consisted of two ten-dollar bags of crack cocaine.

20.  On or about June 20, 2014, physical surveillance and pole
camera surveillance captured the Civic arriving on the Pfeiffer
Street drug set.  As the Civic drove into the area of the
Pfeiffer Street drug set and parked, an unidentified male from a
group of males appeared to be conducting a CDS transaction with
an unknown white female.  A black male matching MILLER's
description then exited the Civic from the driver's side and
conversed with several black males in the group, including K.B.-
1.  A few minutes later, a silver Infiniti, New Jersey
registration T13-DXX (the "silver Infiniti"), pulled up in front
of the group.  MILLER then entered the front passenger side of
the silver Infiniti and departed, heading west on Pfeiffer
Street.  The Civic remained parked on the set.  Approximately a
few hours later, pole camera surveillance captured the silver
Infiniti return to the 500 block of Pfeiffer Street.  MILLER
exited the silver Infiniti and entered the driver's side of the
Civic.  The Civic then departed the Pfeiffer Street drug set.
The silver Infiniti is registered to Tamika Miller, 605 White
Oak Lane, Sewell, New Jersey.  Tamika Miller is MILLER's wife,

20

and I believe based on surveillance that MILLER resides with her at 605 White Oak Lane.

21.  On or about June 26, 2014, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set.  CS-4 attempted to call K.B.-1 twice, but was unsuccessful.  Law enforcement then instructed CS-4 to travel to the Pfeiffer Street drug set.  During the afternoon hours of this day, CS-4 traveled to the Pfeiffer Street drug set, and while en route, received a call from K.B.-1, who instructed CS-4 to meet him at Magnolia Street and Park Boulevard in Camden.  After CS-4 arrived at that location, K.B.-1 approached CS-4's vehicle and sold CS-4 19 bags of crack cocaine for $200.  This quantity of crack cocaine consisted of 19 ten-dollar bags of crack cocaine.

22.  On or about July 1, 2014, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set.  During the morning hours of this day, CS-4 traveled to the Pfeiffer Street drug set, where pole camera surveillance captured CS-4 arriving.  After CS-4's arrival, K.B.-1 exited a residence, approached CS-4's vehicle and sold CS-4 11 bags of crack cocaine for $100.  This quantity of crack cocaine consisted of 10 ten-dollar bags and one "bonus" bag of crack cocaine.

**23.**  On or about July 11, 2014, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set.  During the afternoon hours of this day, CS-4 traveled to the Pfeiffer Street drug set, where pole camera surveillance captured CS-4 arriving.  K.B.-1 exited a residence, approached CS-4's vehicle and sold CS-4 10 bags of crack cocaine for $100.  This quantity of crack cocaine consisted of 10 ten-dollar bags of crack cocaine.

**24.**  On or about July 16, 2014, pole camera surveillance captured MILLER's Civic as it parked on the 500 block of Pfeiffer Street.  MILLER then exited the driver's side of the vehicle and conversed with several individuals on the drug set, including WALL, WISE, KB-1 and an unidentified male.  After a few minutes, MILLER entered the Civic and departed the area. Approximately two hours later, the Civic returned to the Pfeiffer Street drug set, and WALL came to the passenger side of the Civic.  WALL conversed with the driver, whom I believe was MILLER.  A few minutes later, K.B.-1 walked over to the Civic and stood by the passenger side of the Civic.  An unknown vehicle then parked behind the Civic and K.B.-1 conducted a hand-to-hand transaction with the driver.  K.B.-1 then walked back to the Civic and spoke with MILLER.  K.B.-1 then opened the front passenger door and crouched down beside the Civic.  K.B.-1 then sat in the front passenger seat of the Civic.  After K.B.-1

22

exited the Civic, the Civic departed the area.  Approximately five minutes later, while K.B.-1, WALL and an unidentified black male were outside on the 500 block of Pfeiffer Street, the Civic again returned to the Pfeiffer Street drug set.  Upon seeing the Civic, K.B.-1 walked back up the walkway towards 536 Pfeiffer Street.  Approximately one minute later, K.B.-1 walked back to the Civic and entered the front passenger seat.  WALL then entered the rear passenger seat and the Civic departed.

25.  On or about July 18, 2014, pole camera surveillance captured MILLER's Civic as it parked on the 500 block of Pfeiffer Street.  MILLER exited the driver's side and conversed with set workers, who included WALL, WISE, K.B.-1 and an unknown male.  While MILLER was present at the Pfeiffer Street drug set, K.B.-1 conducted a hand-to-hand transaction with the driver of a green-colored Honda.  Approximately a few minutes later, the same green-colored Honda returned to the Pfeiffer Street drug set and K.B.-1 conversed with the driver.  WALL and MILLER then walked over to the green-colored Honda.  WALL reached into the vehicle, and took a small object from the driver, which he then showed to MILLER.  K.B.-1 then handed a different small object to the driver of the green-colored Honda.  I believe that during the first visit the driver in the green-colored Honda received CDS from K.B.-1, but then returned to the Pfeiffer Street drug set because there was a problem with the product.  I also

23

believe that WALL took the CDS from the driver and showed it to MILLER before handing a replacement quantity of CDS to the driver of the green-colored Honda.

26. On or about July 31, 2014, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set. During the morning hours of this day, CS-4 traveled to the Pfeiffer Street drug set, where pole camera surveillance captured CS-4 arriving. K.B.-1 approached CS-4's vehicle and sold CS-4 33 bags of crack cocaine for $300. This quantity of crack cocaine consisted of 30 ten-dollar bags of crack cocaine, plus three free bags of crack cocaine as a "bonus."

27. On or about August 5, 2014, surveillance units observed MILLER's Civic parked on Raritan Street in Camden, one block south of the 500 block of Pfeiffer Street. Law enforcement observed the Civic to be unoccupied. MILLER was subsequently observed driving up behind the Civic in a Silver Chevrolet, Pennsylvania registration JPN-3957 (the "Chevrolet") and parking. A Hispanic male, identified as J.M., exited the front passenger seat of the Chevrolet, reached into the trunk of the Chevrolet, pulled out a plastic bag and handed it to MILLER. MILLER then entered the Civic and departed. Approximately one minute later, pole camera surveillance captured the Civic arrive at the Pfeiffer Street drug set. A black male, identified as

24

M.M., approached the Civic and conversed with the Civic's driver.  The driver of the Civic was then captured conducting a hand-to-hand transaction with M.M.  Based on my training and experience, I believe that MILLER received CDS from J.M. in a plastic bag, which MILLER transferred to the Civic when it was parked on Raritan Street.  MILLER then transported the CDS to the Pfeiffer Street drug set in the Civic and then gave the CDS to M.M. to sell on the Pfeiffer Street drug set.  M.M. has no prior felony convictions.  A criminal history check of J.M. revealed that he has seven arrests and two felony convictions, which include distributing heroin/cocaine and possession of a sawed-off shotgun.  J.M. also has three pending charges for possession of a defaced firearm, possession of a handgun and certain persons not to possess weapons.

28.  On or about August 8, 2014, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set.  CS-4 called K.B.-1 and requested four bundles (on the Pfeiffer Street drug set, a "bundle" is a package of approximately 10 ten-dollar bags of crack cocaine commonly held together with a rubber band), and K.B.-1 instructed CS-4 to travel to "Parkside," which CS-4 understood to mean Park Avenue and Magnolia Street in Camden.  During the afternoon hours of this day, CS-4 traveled to Park Avenue and Magnolia Street and once there, K.B.-1 approached CS-4's vehicle

25

and sold CS-4 35 bags of crack cocaine for $400.  This quantity
of crack cocaine consisted of 35 ten-dollar bags of crack
cocaine.

29.  On or about August 14, 2014, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  During the afternoon hours
of this day, CS-4 traveled to the Pfeiffer Street drug set,
where pole camera surveillance captured CS-4 arriving.  WISE
approached CS-4's vehicle and told CS-4 to drive around the
block.  When CS-4 arrived back at the set, WISE approached CS-
4's vehicle and sold CS-4 30 bags of crack cocaine for $300.
This quantity of crack cocaine consisted of 30 ten-dollar bags
of crack cocaine.

30.  Between on or about August 15, 2014 and August 23, 2014,
physical surveillance and pole camera surveillance captured WISE
operating MILLER's Civic.  Investigation determined that MILLER
was out of town during this period.  During that time, pole
camera surveillance captured WISE conducting multiple hand-to-
hand transactions on the Pfeiffer Street drug set.  On or about
August 18, 2014, pole camera surveillance captured WISE
conducting a hand-to-hand transaction with the occupant of a
silver-colored pickup truck, then entering the Civic and
departing.

31.  On or about August 21, 2014, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  During the morning hours of
this day, CS-4 traveled to the Pfeiffer Street drug set, where
pole camera surveillance captured CS-4 arriving.  WALL
approached CS-4, who asked WALL for "five bundles."  WALL then
entered 536 Pfeiffer Street, and while WALL was in the
residence, WISE walked over to CS-4's vehicle and conversed with
CS-4.  After a short time, WALL exited 536 Pfeiffer Street and
handed CS-4 53 bags of crack cocaine in exchange for $500.  This
quantity of crack cocaine consisted of 50 ten-dollar bags of
crack cocaine, plus three free bags of crack cocaine as a
"bonus."  During the controlled purchase, WISE gave CS-4 his
phone number, (856) 676-8673 (WISE FACILITY 1), and WALL gave
CS-4 his phone number, (856) 254-9434 (WALL FACILITY 1).

32.  On or about August 26, 2014, pole camera surveillance
captured MILLER's Civic as it arrived on the Pfeiffer Street
drug set and parked behind a white Ford SUV, Virginia
registration VBB-5041 (the "Ford").  MILLER then exited the
Civic and walked over to the rear of the Ford, the rear
hatchback-style door of which was open.  WALL, who was on the
Pfeiffer Street drug set prior to MILLER's arrival, walked over
to the rear of the Ford with MILLER.  Approximately one minute
later, J.M. exited the Ford's driver's seat and walked to the

27

rear of the Ford with MILLER and WALL.  After all three stood at
the rear of the Ford for several minutes, MILLER carried a large
box from the Ford to the Civic and placed the box in the back of
the Civic.  After he conversed with J.M. and WALL on the street,
MILLER entered the Ford with J.M. and departed.  Approximately
30 minutes later, the Ford returned to the Pfeiffer Street drug
set.  MILLER exited the Ford, entered the Civic, and departed.

33.  On or about August 29, 2014, pole camera surveillance
captured MILLER's Civic dropping off K.B.-1 at the Pfeiffer
Street drug set.  Later the same day, pole camera surveillance
captured WALL being dropped off by the Civic at the Pfeiffer
Street drug set.

34.  On or about September 4, 2014, at approximately 2:46 p.m.,
pole camera surveillance captured the Civic parked on the 500
block of Pfeiffer Street.  While parked on the 500 block of
Pfeiffer Street, WALL walked to the driver's side window and
spoke with the driver, whom I believe was MILLER.  At
approximately 2:52 p.m., a green-colored Mazda, New Jersey
Registration W77-AFS ("the Mazda"), drove up behind the Civic
and stopped.  WALL reached into the Civic, retrieved an object
from the interior of the Civic, and walked back to the Mazda.
As WALL reached the Mazda, the object was observed to be a
plastic bag containing multiple small yellow-colored objects.
These yellow-colored objects are substantially similar in

28

appearance to individual packets of crack cocaine packaged for
distribution by the Pfeiffer Street drug set.  These individual
packets have been observed on several previous occasions during
controlled purchases from the Pfeiffer Street drug set.
Immediately after retrieving the packets from the Civic, WALL
conducted a hand-to-hand transaction with the driver of the
Mazda, handing over some of the packets retrieved from the Civic
to the driver of the Mazda.  WALL then walked back to the Civic
and appeared to hand U.S. currency to MILLER.  WALL then
secreted the bag containing the remaining packets on his person.
At approximately 2:59 p.m., WALL conducted another hand-to-hand
transaction with an unknown black male on a bicycle near the
Civic while MILLER was still in the driver's seat of the Civic.
The Civic departed at approximately 3:06 p.m.

35.  On September 11, 2014, CS-4 was directed by law enforcement
to make a consensually-recorded telephone call to WALL at WALL
FACILITY 1.  Law enforcement agents observed CS-4 dial WALL
FACILITY 1's number and overheard the call.  During this call,
CS-4 inquired of WALL if he was "around" and asked "can I come
see you?"  CS-4 also requested the "same as last time, I need
five."  WALL responded to CS-4 that he was "around," which meant
to law enforcement and CS-4 that WALL was at the Pfeiffer Street
drug set.  CS-4 then drove to the Pfeiffer Street drug set, met
with WALL and purchased five bundles of crack cocaine for $500.

29

36.   On or about September 18, 2014, at approximately 1:51 p.m.,
pole camera surveillance captured the Civic on the 500 block of
Pfeiffer Street.  MILLER conversed with WALL and PLUMMER.
MILLER, WALL and PLUMMER then walked down the walkway toward 536
Pfeiffer Street and out of the camera's view.  WALL walked back
into the camera view a short time later.  At approximately 2:22
p.m., MILLER walked back into the camera's view.  A short time
later, an unknown white male and an unknown black male on a
bicycle arrived at the 500 block of Pfeiffer Street and
conversed with WALL and MILLER.  Following a brief conversation
with the unknown males, WALL walked back up the walkway toward
536 Pfeiffer Street and entered the residence.  MILLER followed
WALL up the walkway, but stopped in front of the door of 536
Pfeiffer Street and spoke with PLUMMER while PLUMMER was seated
on the steps in front of the residence.  A short time later,
WALL exited 536 Pfeiffer Street and conducted a hand-to-hand
transaction with the two unknown males while MILLER stayed by
the front door.  Following the transaction, WALL was observed
counting money.  I believe that WALL sold CDS to the unknown
males in front of MILLER.  At approximately 2:29 p.m., MILLER
and PLUMMER entered a white-colored Ford Explorer ("the
Explorer") and departed.  At approximately 3:07 p.m., the
Explorer returned to the Pfeiffer Street drug set, and WALL
spoke with someone in the vehicle.  The Explorer then pulled to

30

the curb of the street and parked.  WALL then entered 536
Pfeiffer Street.  A short time later, WALL exited the residence
and approached the front passenger side of the Explorer.  WALL
looked at an object in his hand, and handed the object to
someone in the Explorer through the front passenger window.  The
Explorer then departed.  At approximately 6:22 p.m., the
Explorer returned to the Pfeiffer Street drug set, and MILLER
exited the front passenger side of the vehicle.  MILLER entered
the Civic and departed.  Based on the aforementioned
observations, I believe that MILLER was the front seat passenger
of the Explorer when it returned to the Pfeiffer Street drug
set, and that WALL handed MILLER CDS or proceeds of CDS sales
when he reached into the Explorer through the front passenger
window.

37.  On or about November 7, 2014, law enforcement conducted a
controlled purchase of crack cocaine and heroin from the
Pfeiffer Street drug set utilizing CS-4.  While in the presence
of law enforcement, CS-4 contacted WALL at WALL FACILITY 1 to
arrange for the purchase of $500 worth of crack cocaine and $200
worth of heroin.  Law enforcement observed CS-4 dial WALL
FACILITY 1's number from CS-4's cellular telephone.  During this
consensually-recorded telephone call, CS-4 told WALL, "I need
five of the regular" and "I got five hundred for that."  CS-4
also told WALL, "just two, two for the other."  CS-4 later

31

stated, "seven hundred total."   WALL acknowledged CS-4's order

and told CS-4 to give him "like fifteen minutes."   CS-4 then

drove to the Pfeiffer Street drug set and purchased $500 worth

of crack cocaine and $200 worth of heroin from WALL.   During

this meeting, CS-4 received 52 bags of crack cocaine and 20 bags

of heroin from WALL.

38.   On or about November 15, 2014 at approximately 4:11 p.m.,

pole camera surveillance captured MILLER's Civic arrive on the

500 block of Pfeiffer Street.   No set workers were present at

this time on the Pfeiffer Street drug set selling CDS.   The

Civic parked and the driver stayed in the car.   At approximately

4:25 p.m., pen register information indicates that WALL FACILITY

1 received a call from (856) 689-0179 (Miller).   At

approximately 4:30 p.m., an unknown male on a bicycle approached

the Civic and conversed with the driver for a short time.   At

approximately 4:41 p.m., the Civic departed.   Approximately one

minute later, a green-colored Pontiac Bonneville bearing New

Jersey registration N69-DWA (the "Pontiac") arrived on the 500

block of Pfeiffer Street.   Based on the investigation thus far,

the Pontiac is used almost exclusively by WISE.   On this

occasion, WALL exited the front passenger side of the Pontiac

and walked into 536 Pfeiffer Street.   At approximately 4:48

p.m., WISE exited the Pontiac and conducted two hand-to-hand

transactions.   At approximately 4:49 p.m., (856) 689-0179

(Miller) received a call from WALL FACILITY 1.  A few minutes later, the Civic returned to the 500 block of Pfeiffer Street and parked.  At approximately 5:04 p.m., WALL walked over to the Civic, opened the front passenger door, and conversed with the driver.  WISE then walked over to the vehicle and stood behind WALL.  At approximately 5:06 p.m., a vehicle pulled up alongside the Civic and WISE conducted a hand-to-hand transaction with the driver of the vehicle.  At approximately 5:08 p.m., the Civic departed.  I believe that MILLER was driving the Civic and called WALL because there were no set workers selling CDS on Pfeiffer Street.  Additionally, after arriving on the Pfeiffer Street drug set with WISE, WALL called MILLER to let him know they were there.  This call prompted MILLER to return to the Pfeiffer Street drug set.  WISE also conducted a hand-to-hand transaction in front of MILLER prior to MILLER's departure.

39.  On or about November 19, 2014, from approximately 1:19 p.m. to 1:38 p.m., pole camera surveillance captured WALL conduct three hand-to-hand transactions in front of 536 Pfeiffer Street. At approximately 2:03 p.m., MILLER's Civic arrived on the 500 block of Pfeiffer Street and parked in front of 536 Pfeiffer Street.  MILLER exited the driver's side of the Civic and walked to the front of 536 Pfeiffer Street, where WALL was standing. WALL then counted U.S. currency while MILLER watched.  A few minutes later, WALL handed MILLER U.S. currency, which MILLER

33

placed in his pocket.  MILLER then entered the Civic and
departed.  Approximately one minute later, WALL walked down to
the street and conducted a hand-to-hand transaction with an
unknown white male in a vehicle.  I believe that MILLER traveled
to the Pfeiffer Street drug set on this occasion in order to
collect the proceeds of WALL's CDS sales.

40.  On or about November 21, 2014, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  Prior to conducting the
controlled purchase, CS-4 sent multiple text messages to WALL
FACILITY 1 to let WALL know that CS-4 would be coming to see him
at the Pfeiffer Street drug set to purchase CDS.  CS-4 then
drove to the Pfeiffer Street drug set.  Upon arrival, CS-4
called WALL at WALL FACILITY 1 and told WALL, "I'm outside."
WALL asked CS-4, "so what you want?"  CS-4 told WALL that CS-4
had "five hundred" and that CS-4 wanted a "bonus."  After this
conversation, CS-4 met with WALL on the Pfeiffer Street drug
set, and purchased $500 worth of suspected crack cocaine.  CS-4
received 55 bags of suspected crack cocaine from WALL during
this consensually audio and video recorded meeting.

41.  On or about December 4, 2014, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  At the direction of law
enforcement, CS-4 sent a text message to WALL FACILITY 1 but did

not receive a response.  CS-4 then made a call to WALL FACILITY
1 that was not answered.  A short time later, CS-4 received a
call from WALL utilizing WALL FACILITY 1.  During this
consensually-recorded conversation, CS-4 told WALL that CS-4 had
$500 and that CS-4 wanted a "bonus."  CS-4 then agreed to meet
WALL in ten to fifteen minutes.  CS-4 then drove to Pfeiffer
Street to meet WALL.  Once on Pfeiffer Street, CS-4 again called
WALL FACILITY 1 to tell WALL that CS-4 was there.  WALL then
directed CS-4 to the Parkside section of Camden to complete the
transaction.  Once in the Parkside section of Camden, CS-4 again
talked to WALL while WALL was utilizing WALL FACILITY 1 in order
to find the exact meeting location.  CS-4 then met with WALL and
gave WALL $500 for the crack cocaine.  During this meeting, WALL
told CS-4 that CS-4 was getting a "bonus" and also getting one
bag of "dope."  During this controlled purchase, WALL sold CS-4
54 bags of suspected cocaine, which included four bags of crack
cocaine as a "bonus," and one bag of heroin ("dope") as an
additional "bonus."

42.  On or about December 19, 2014, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  At the direction of law
enforcement, CS-4 sent multiple text messages to WALL in order
to arrange the purchase later that same day.  CS-4 then
travelled to Pfeiffer Street to meet with WALL and purchase $500

worth of crack cocaine. During the consensually audio and video recorded meeting with CS-4, WALL asked CS-4, "what you want?" CS-4 told WALL that CS-4 wanted "five and a bonus." WALL then handed CS-4 50 bags of suspected crack cocaine in exchange for $500. WALL then told CS-4 that he was "about to get you some more." WALL then walked to the area of the entryway of 536 Pfeiffer Street and returned to CS-4's vehicle with five additional bags of suspected crack cocaine for free, as a "bonus." Also during this controlled purchase, WALL told CS-4 that "yesterday, someone called the cops on me and gave them my description." In fact, pole camera surveillance from December 18, 2014 captured WALL being detained by the police on the Pfeiffer Street drug set shortly after completing a hand-to-hand transaction. WALL was briefly detained by Camden County police officers, but released without being arrested. WALL was released by the police at approximately 1:13 p.m. Approximately ten minutes later, WALL made an outgoing call to MILLER. Within one minute of the outgoing call to MILLER, WALL made an outgoing call to WISE. Based on my training, experience, and information gathered during the course of this investigation, these calls are consistent with a drug set manager first calling the drug set owner and then secondly another drug set manager to notify them of the recent police activity on the drug set.

**43.** On or about December 22, 2014, pole camera surveillance
captured MILLER's Civic parked on the Pfeiffer Street drug set.
Law enforcement officers observed WALL standing near the
passenger window of the Civic for several minutes.  During this
time, WALL engaged in a hand-to-hand transaction with an
individual on a bicycle and then returned to the passenger
window area of the Civic.  WALL was later observed counting what
appeared to be U.S. currency.  WALL then entered the Civic and
departed in the Civic.  Approximately fifteen minutes later, the
Civic returned to the area of the Pfeiffer Street drug set.  At
this time, MILLER was observed driving the Civic.  WALL remained
in the Civic with MILLER for approximately ten minutes, then
exited the Civic.  Approximately seven minutes later, an unknown
vehicle arrived and parked behind the Civic.  An unknown male
exited the vehicle, hugged WALL, and then entered the Civic and
departed.  The Civic then returned to the area of the Pfeiffer
Street drug set occupied by MILLER and the same unknown male.
Approximately 25 minutes after MILLER returned, a Mercury Sport
Utility Vehicle (the "Mercury SUV") arrived on the Pfeiffer
Street drug set.  MILLER exited the Civic, and then spoke to the
individual in the driver's seat of the Mercury SUV.  MILLER
looked around the area of the Pfeiffer Street drug set, then
cupped one hand around his mouth and yelled across the street in
the direction of 536 Pfeiffer Street.  MILLER then removed his

37

cellular telephone from his pocket and made a telephone call.
At the same time MILLER was observed using his cellular phone
(approximately 2:07 p.m.), the pen register on MILLER'S
telephone ((856) 689-0179 (MILLER)) captured an attempted call
to WALL at WALL FACILITY 1.  According to MILLER'S pen register,
this call went unanswered by WALL.  Approximately one minute
after MILLER attempted to call WALL, WALL was observed standing
at the Mercury SUV.  WALL then walked towards 536 Pfeiffer
Street and returned to the Mercury SUV moments later.  WALL'S
behavior was consistent with a hand-to-hand drug transaction.
MILLER appeared to engage the waiting customer prior to
attempting to locate WALL to complete the hand-to-hand
transaction.

44.  On or about January 16, 2015, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from the Pfeiffer Street drug set.  In the morning hours, at the
direction of law enforcement, CS-4 exchanged multiple text
messages with WALL over WALL FACILITY 1 in order to arrange the
purchase.  CS-4 then travelled to the Pfeiffer Street drug set
to meet with WALL to purchase $500 worth of crack cocaine.  Once
on the Pfeiffer Street drug set, CS-4 sent a text message to
WALL at WALL FACILITY 1 to inform WALL that CS-4 had arrived.
CS-4 then called WALL at WALL FACILITY 1.  During the call,
which was overheard by law enforcement officers, WALL told CS-4

to meet him on Walnut Street in Camden.  CS-4 proceeded to the
vicinity of the intersection of Princess Avenue and Walnut
Street in the Parkside section of Camden and arrived at
approximately 10:30 a.m.  During this consensually audio and
video recorded meeting, WALL sold CS-4 51 bags of crack cocaine
for $500.  Also during this meeting, WALL advised CS-4, "[i]t's
hot as a motherfucker around this spot," which law enforcement
and CS-4 understood to mean that there was significant law
enforcement presence in the area.  When CS-4 inquired as to why
WALL was not at the Pfeiffer Street drug set, WALL stated, "my
motherfucking young boys be out there," which law enforcement
and CS-4 understood to mean that instead of WALL, younger set
workers were present selling CDS on the Pfeiffer Street drug
set.  WALL also pointed to a vacant lot in the vicinity of
Walnut Street and told CS-4, "the fucking cops be sitting over
there, watching these niggers that be hustling and shit."

**45.**  On or about January 16, 2015 at approximately 3:57 p.m.,
pole camera surveillance captured WISE's Pontiac arriving at the
500 block of Pfeiffer Street and parking.  A few minutes later,
an unknown male, identified by law enforcement as a set worker
on the Pfeiffer Street drug set, exited 536 Pfeiffer Street and
entered the Pontiac through the front passenger door.  At
approximately 4:09 p.m., MILLER's Civic arrived at the Pfeiffer
Street drug set and parked.  Shortly thereafter, WISE was

observed exiting the Pontiac and walking toward the Civic.  As
WISE walked over to the Civic, MILLER exited the driver's side
of the Civic and met WISE on the sidewalk.  As they conversed,
both WISE and MILLER both looked up and down Pfeiffer Street.
WISE was then observed handing an object to MILLER, which MILLER
then placed in his right side jacket pocket.  After
approximately one minute, MILLER entered the Civic and departed,
while WISE entered the driver's side of the Pontiac.  At
approximately 4:12 p.m., the unknown male set worker who was
seated in the Pontiac with WISE exited the vehicle and conducted
a hand-to-hand transaction with an unknown female.  Based on my
training and experience, the training and experience of other
agents involved in this investigation, the observations of law
enforcement as set forth in this paragraph, and information
gained during this investigation, I believe that MILLER was
present on the Pfeiffer Street Drug set in order to monitor the
sale of CDS on the Pfeiffer Street drug set, confer with set
workers, retrieve monetary proceeds of CDS sales, a quantity of
unsold CDS, or conduct other similar activities related to the
sale of CDS by the Pfeiffer Street drug set.

46.  On or about January 30, 2015, utilizing CS-4, law
enforcement conducted a controlled purchase of crack cocaine
from WALL.  At the direction of law enforcement, CS-4 exchanged
multiple text messages over WALL FACILITY 1 in order to arrange

the purchase.  CS-4 received a reply text from WALL that read, "Yea wat u want."  CS-4 responded with a text requesting $500 worth of crack cocaine, plus a "bonus."  WALL sent CS-4 another text indicating that the meeting place would be in "Parkside." Based on the previous interaction with WALL on January 16, 2015 as described above, law enforcement and CS-4 believed that when WALL sent a text message that stated he would meet CS-4 in "Parkside," WALL was instructing CS-4 to meet him in the vicinity of Princess Avenue and Walnut Street in the Parkside section of Camden.  Pole camera surveillance then captured CS-4's vehicle as it arrived at the intersection of Princess Avenue and Walnut Street.  Upon CS-4's arrival, CS-4 called WALL FACILITY 1 to advise WALL that CS-4 was at the meeting location. Pole camera surveillance then captured WALL as he exited the residence at 1220 Walnut Street and entered CS-4's vehicle. During this consensually audio and video recorded meeting, WALL sold CS-4 52 bags of suspected crack cocaine in exchange for $500.  After a short time, WALL exited CS-4's vehicle and re-entered 1220 Walnut Street.

**47.**  On or about February 4, 2015 at approximately 4:10 p.m., pole camera surveillance captured MILLER's Civic pull up to the 500 block of Pfeiffer Street.  An unknown male set worker walked up to the Civic, appeared to briefly converse or attempt to converse with MILLER, then walked away.  At approximately 4:53

p.m., a dark-colored Chevrolet Suburban, New Jersey registration X87-BSK (the "Suburban"), pulled up to the 500 block of Pfeiffer Street.   Based on prior observations recorded by pole camera surveillance, law enforcement identified the driver of the Suburban as K.B.-2, a resident of Burlington County, New Jersey.[9] At the same time, WISE's Pontiac arrived on the 500 block of Pfeiffer and parked across the street from the Civic.   WALL then exited the Suburban and walked over to the passenger side of the Civic.   As WALL walked toward the Civic, the unknown male who previously walked over to the Civic conducted a hand-to-hand transaction with K.B.-2.   As WALL reached the Civic, WISE walked over from the other side of the street to where WALL was standing.   At approximately 5:06 p.m., WALL entered the front passenger seat of the Civic and departed.   Approximately one minute later, WISE departed in the Pontiac.   Based on my training and experience, the training and experience of other agents involved in this investigation, the observations of law enforcement as set forth in this paragraph, and information

---

[9]    A cellular telephone number utilized by K.B.-2 was also identified during the investigation.   A further check revealed no vehicles registered to K.B.-2.   An NCIC database search reveals that K.B.-2 has a criminal history that includes: (1) a June 18, 1999 arrest by the New Jersey State Police that resulted in a felony conviction on September 5, 2000 for possession of CDS with the intent to distribute within 1000 feet of school property, for which K.B.-2 was sentenced to five years of probation supervision and; (2) a July 7, 2000 arrest by the Medford, New Jersey police that resulted in a felony conviction on November 27, 2000 for forged writing, for which K.B.-2 was sentenced to five years of probation supervision.

gained during this investigation, I believe that MILLER was "checking in" with the Pfeiffer Street drug set in order to monitor the sale of CDS on the Pfeiffer Street drug set, confer with set managers WALL and WISE, retrieve monetary proceeds of CDS sales, retrieve a quantity of unsold CDS, or conduct other similar activities related to the sale of CDS by the Pfeiffer Street drug set.

**48.** On February 13, 2015, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from WALL. At the direction of law enforcement, CS-4 exchanged multiple text messages with WALL over WALL FACILITY 1 in order to arrange the purchase. Based on previous interaction with WALL, CS-4 and law enforcement believe that when WALL texted CS-4 that WALL was going to be "out east," WALL was instructing CS-4 to meet him on the Pfeiffer Street drug set, which is located in East Camden, also known simply as "East" or "out East." Pole camera surveillance then captured CS-4's vehicle as it arrived and parked on the 500 block of Pfeiffer Street. Upon CS-4's arrival, WALL exited a red and white-colored taxi cab and conversed with CS-4 through the front passenger side window of CS-4's vehicle. WALL then sold CS-4 55 bags of crack cocaine for $500. This CDS transaction was audio and video recorded.

After the CDS transaction was complete, pole camera surveillance captured WALL entering 536 Pfeiffer Street.

**49.** On or about March 1, 2015, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from the Pfeiffer Street drug set. Prior to conducting the controlled purchase, CS-4 sent multiple text messages to WALL FACILITY 1 to let WALL know that CS-4 would be coming to see WALL at the Pfeiffer Street drug set to purchase CDS. During the afternoon hours, CS-4 sent WALL a text to WALL FACILITY 1 that indicated that CS-4 would be arriving at WALL's location shortly to purchase CDS. Approximately one minute later, WALL sent a return text from WALL FACILITY 1 that stated that WALL was present at the Pfeiffer Street drug set and asked CS-4 what quantity of CDS CS-4 wanted to purchase. CS-4 sent another text to WALL FACILITY 1 stating that CS-4 wanted to purchase $500 worth of crack cocaine and that CS-4 wanted a "bonus." WALL sent a return text indicating that WALL could complete the CDS transaction. CS-4 then drove to the Pfeiffer Street drug set, where pole camera surveillance captured CS-4 arriving. WALL approached CS-4 and sold CS-4 54 bags of crack cocaine for $500. This quantity of crack cocaine consisted of 50 ten-dollar bags of crack cocaine, plus four free bags of crack cocaine as a "bonus."

50.  On or about March 5, 2015 at approximately 8:58 a.m., law enforcement intercepted a call from MILLER to WALL FACILITY 1. During the call, MILLER told WALL, "I'm a need to come see you man today, 'cause I pay them bills today.  Man, the fifth," to which WALL replied "Alright."  Subscriber information and electronic surveillance indicated that MILLER was calling from a hotel in Burlington County, New Jersey.  I believe that MILLER was going to see WALL to pick up monetary proceeds of CDS sales on the Pfeiffer Street drug set, consistent with his role as owner of the drug set.

51.  On or about March 6, 2015, utilizing CS-4,[10] law enforcement conducted a controlled purchase of crack cocaine from the

---

[10]  CS-4 is a reliable and credible confidential source.  Information provided by CS-4 has been corroborated by other law enforcement sources, consensually recorded conversations as set forth in this Affidavit, observations made during physical surveillance, footage obtained from pole camera surveillance, and data obtained from the GPS trackers.  CS-4 has one prior felony conviction for Possession of CDS. CS-4 has received monetary compensation for his cooperation with law enforcement.

CS-4 initially came to the attention of law enforcement because CS-4 was observed on pole camera surveillance on multiple occasions purchasing CDS from the Pfeiffer Street drug set.  CS-4 was approached by law enforcement and agreed to cooperate.  CS-4 admitted to purchasing CDS from the Pfeiffer Street drug set.  CS-4 also initially identified WISE as the owner of the Pfeiffer Street drug set and identified WALL as a resident of 536 Pfeiffer Street. On or about March 4, 2015, a call to WALL FACILITY 1 from CS-4 was intercepted. This call was unauthorized contact between CS-4 and WALL.  During this intercepted call, CS-4 attempted to arrange an unauthorized purchase of CDS from WALL.  FBI agents made contact with CS-4 before CS-4 was able to complete the unauthorized CDS purchase.  During this meeting, CS-4 admitted to several prior unauthorized purchases of CDS from WALL for personal use.  FBI agents formally admonished CS-4, and CS-4 was able to continue as an FBI CS.

45

Pfeiffer Street drug set.  Prior to conducting the controlled purchase, CS-4 exchanged multiple text messages with WALL over WALL FACILITY 1 to let WALL know that CS-4 would be coming to see him at the Pfeiffer Street drug set to purchase $500 worth of crack cocaine.  At approximately 1:38 p.m., pole camera surveillance captured CS-4 pull up on the 500 block of Pfeiffer Street.  WALL then walked up CS-4's window and exchanged 54 bags of suspected crack cocaine for $500.

52.  On or about March 10, 2015 at approximately 1:41 p.m., law enforcement intercepted a call from (856) 426-4380 (MILLER) to WALL FACILITY 1.  MILLER asked, "Yeah what was you trynna do?  You was ready, or nah?"  WALL responded, "Man, I was waiting for that nigga all day, man.  He ain't never come back.  Well, he came back but he just left, though."  WALL then said, "I said I was ready, I, I thought he was coming back."  MILLER responded, "Yeah, so we'll be over in a little bit if you just got out the shower.  Just wait for us then, and then when he come get me, we'll be over."  I believe that WALL and MILLER were referring to PLUMMER picking them up.

53.  On or about March 10, 2015 at approximately 2:31 p.m., law enforcement intercepted a call to WALL FACILITY 1 from MILLER.  MILLER asked WALL, "Still at the crib?," to which WALL responded, "Yeah."  MILLER then told WALL, "Aight, we ready to

pull out right now, two minutes."  I believe that MILLER was referring to 1220 Walnut Street, a known residence of WALL, when he said "crib."

54.  On or about March 10, 2015 at approximately 2:39 p.m., pole camera surveillance captured WALL as he exited 1220 Walnut Street and waited on the porch of 1220 Walnut Street for several minutes.  At approximately 2:43 p.m., PLUMMER's Durango arrived at 1220 Walnut Street and parked on the street.  WALL walked down to the Durango and entered the rear passenger seat of the Durango behind the driver.  A few minutes later, WALL exited the Durango and entered 1220 Walnut Street.  At approximately 2:46 p.m., WALL exited 1220 Walnut Street and entered the rear driver's side passenger seat area of the Durango again.  After staying parked for several minutes, the Durango departed and drove north on Walnut Street.

55.  On or about March 10, 2015 at approximately 2:57 p.m., pole camera surveillance captured the Durango arriving on the Pfeiffer Street drug set and parking.  WALL was then observed exiting the rear passenger seat of the Durango and entering 536 Pfeiffer Street.  After a few minutes, WALL exited 536 Pfeiffer Street and entered the rear passenger seat of the Durango.  The Durango then departed and headed west on Pfeiffer Street.  I believe that PLUMMER and MILLER picked WALL up from 1220 Walnut

Street so that WALL could resupply the Pfeiffer Street drug set with CDS.  In this specific instance, I believe that WALL brought an additional quantity of CDS to the Pfeiffer Street drug set and stored it inside 536 Pfeiffer Street.

56.  On or about March 11, 2015 at approximately 10:25 p.m., law enforcement intercepted a call from (856) 426-4380 (MILLER) to WALL FACILITY 1.  During the call, WALL asked MILLER, "Hey, yo, SHEED ever call you?"  MILLER replied, "Nah, he ain't never call me."  WALL then stated, "I got something for him, though.  I got something for his ass.  I'm going to starve his ass the whole time you're gone, too."  Later in the call, MILLER stated, "Yo, I still might need to come through there.  Did you get anywhere or nah?"  WALL responded, "Nah, I had motherfucking two hundred on me all day."  I believe that MILLER wanted to travel to the Pfeiffer Street drug set to meet with WALL and collect proceeds from the sale of CDS on the Pfeiffer Street drug set prior to MILLER traveling out of town, but WALL informed MILLER that he currently had only $200 in proceeds on his person.  I further believe that the call shows that as the owner, MILLER was checking to see how much CDS had been sold on his set in order to collect proceeds from WALL.

57.  On or about March 11, 2015 at approximately 10:29 p.m., law enforcement intercepted a call from WISE FACILITY 1 to WALL FACILITY 1.  During the call WALL stated, "You ain't call him,

nigga!" WISE responded, "Look, give me his number. I know what I'm ready to tell him what to do. Tell him to put that shit right in his car, and I will go get his car." WALL then gave WISE the number, reciting "426-4380," which law enforcement identified as the last seven digits of MILLER's cellular telephone number. WISE finished this call by telling WALL, "[a]lright, I'm a call right now." I believe that WALL wanted WISE to contact MILLER regarding the retrieval of CDS that would be used to resupply the Pfeiffer Street drug set. WISE explained to WALL that he would call MILLER and tell MILLER to leave the CDS in MILLER's vehicle so that WISE could retrieve it later. I further believe that the call shows that MILLER is responsible for ensuring that the set workers had CDS to sell on the set.

58. On or about March 14, 2015 at approximately 7:37 p.m., law enforcement intercepted a call from K.B.-2 to WALL FACILITY 1. During the call, K.B.-2 asked, "Yo, where you at?" WALL responded, "I'm home." K.B.-2 then stated, "Alright, I'll be there in a couple of minutes." K.B.-2 told WALL, "I need six, alright?" I believe that K.B.-2 was asking to purchase six bags of crack cocaine from WALL.

59. On or about March 14, 2015 at approximately 7:49 p.m., law enforcement intercepted a call from K.B.-2 to WALL FACILITY 1. During the call, K.B.-2 stated, "Yo, I'm here," to which WALL

responded "Alright, here I come."  At approximately 7:50, pole
camera surveillance captured a black colored Chevrolet Suburban,
New Jersey registration X87-BSK (the "Suburban"), arrive at 1220
Walnut Street and park.  Approximately a few minutes later, an
individual matching WALL's description exited the residence at
1220 Walnut Street, went to the driver's side window of the
Suburban, then re-entered the residence.  Approximately one
minute later, the same individual exited the residence, entered
the front passenger seat and the vehicle departed.  I believe
that K.B.-2 drove directly to WALL's residence at 1220 Walnut
Street and purchased CDS from WALL.  WALL was then transported
from 1220 Walnut Street in the Suburban by K.B.-2.

60.  On or about March 16, 2015 at approximately 1:47 p.m., law
enforcement intercepted a call from WILKERSON to WALL FACILITY
1.  During the call, WILKERSON told WALL, "Oh, no, I was just
calling you, shit can is a drizzod," and then stated, "I said, I
said shit can is dry right now, you feel me?"  WALL responded,
"Oh, alright, here I go."  During the time of the call, pole
camera surveillance captured WILKERSON on the 500 block of
Pfeiffer Street with a phone to his ear.  I believe that
WILKERSON was present on the Pfeiffer Street drug set and was
telling WALL that he had run out of CDS ("drizzod," code for
"dry") to sell on the drug set.  WALL then responded by

informing WILKERSON that he was taking action to resupply the Pfeiffer Street drug set with CDS.

61. On or about March 16, 2015 at approximately 2:05 p.m., pole camera surveillance captured PLUMMER and WALL exit 1220 Walnut Street and enter PLUMMER's Durango.  Approximately one minute later, WALL exited the Durango and appeared to receive something from someone at the door of 1220 Walnut Street, then re-enter the Durango.  After approximately a few minutes, the Durango departed and drove south on Walnut Street.  At approximately 2:19 p.m., pole camera surveillance captured the Durango arriving on the 500 block of Pfeiffer Street and parking.  WALL exited the DURANGO and walked with WILKERSON into 536 Pfeiffer Street.  I believe that PLUMMER transported WALL to the Pfeiffer Street drug set in order to resupply or "re-up" the supply of CDS available for sale on the Pfeiffer Street drug set.

62. On or about March 16, 2015 at approximately 4:16 p.m., law enforcement intercepted a call from K.B.-2 to WALL FACILITY 1. During the call, K.B.-2 asked WALL, "Where you at?"  WALL responded, "East."  K.B.-2 then stated, "Alright, just stay there.  I'll be there in a minute.  I'm on the Pike."  WALL asked K.B.-2, "Alright, what you want?"  K.B.-2 replied, "Uh, seven, and I got extra for you, too."  I believe that K.B.-2 called WALL to advise WALL that K.B.-2 was traveling to Camden to purchase CDS from WALL and was inquiring where K.B.-2 could

meet WALL to complete the CDS purchase.  During this
conversation law WALL advised K.B.-2 that he was "East,"
referring to the Pfeiffer Street drug set, located in the East
Camden neighborhood, and K.B.-2 requested to purchase a specific
amount of CDS from WALL.

63.  On or about March 16, 2015 at approximately 4:23 p.m., pole
camera surveillance captured the Suburban arrive at the Pfeiffer
Street drug set and park.  WALL approached the Suburban and
conducted a hand-to-hand transaction with the driver of the
vehicle through the front passenger window.  Following the hand-
to-hand transaction, K.B.-2's Suburban departed and drove west
on Pfeiffer Street.  I believe that K.B.-2 arrived at the
Pfeiffer Street drug set and purchased the requested amount of
CDS from WALL.

64.  On March 16, 2015 at approximately 4:36 p.m., law
enforcement intercepted a text message from K.B.-2 to WALL
FACILITY 1 that asked, "Yo, when you gonna re-up with the good
shit."  A few minutes later, law enforcement intercepted another
text from K.B.-2 to WALL FACILITY 1 that read "Yo what's up with
the soft shit."  At approximately 4:51 p.m., law enforcement
intercepted a text from K.B.-2 to WALL FACILITY 1 that read, "I
know you see my text."  At approximately 5:12 p.m., law
enforcement intercepted a text from WALL FACILITY 1 to K.B.-2
that read, "Man dats wat I got for now wtf."  I believe that

K.B.-2 was unhappy with the quality of the crack cocaine because it was "soft," and wanted to know when WALL would re-supply with better quality crack cocaine.  WALL advised K.B.-2 that the "soft" crack cocaine was the only CDS he had at that time.

65.  On or about March 16, 2015 at approximately 5:21 p.m., law enforcement intercepted a call from (856) 993-4038 (PLUMMER) to WALL FACILITY 1.  During the call, PLUMMER told WALL, "Hey yo, CUZ said, CUZ said he needs three hundred," to which WALL responded, "for what?"  PLUMMER replied, "He want me to put it in MEEK MILLY uh, he want me to put it in Meek Milly account." Later in the call, WALL asked, "So, how you going to get it?" PLUMMER responded, "How he gonna get or how you gonna get?  I'm about to pay it from you," to which WALL responded, "Oh, alright."  I believe that MILLER, who was referred to in previous calls as "CUZ," told PLUMMER to tell WALL to deposit money into Tamika MILLER's bank account.  Tamika MILLER is MILLER's wife and her social media user name is "MEEK MILLZ." Furthermore, I believe that the money MILLER wanted WALL to deposit into his wife's account, was proceeds of CDS sales from Pfeiffer Street drug set.

66.  On or about March 16, 2015 at approximately 5:56 p.m., law enforcement intercepted a call from (856) 993-4038 (PLUMMER) to WALL FACILITY 1.  During the call, PLUMMER stated, "Well, that nigger just text me and told me tell you just need five."  WALL

53

responded, "Nah, it's cool. That's on him, though. That's on him." I believe that MILLER texted PLUMMER to have WALL deposit $500 instead of $300 into Tamika MILLER's account. A review of Tamika MILLER's TD Bank account records revealed that $500 in cash was deposited into a Camden branch at approximately 6:36 p.m. on March 16, 2015. Bank surveillance video captured PLUMMER operating a black vehicle at a drive-up window making the deposit between 6:30 p.m. and 6:37 p.m. on that date.

67. On or about March 16, 2015, at approximately 6:23 p.m., law enforcement intercepted a call from WILKERSON to WALL FACILITY 1. During this call, WILKERSON told WALL, "Ain't nobody out here got no um, no uh, no yerts," to which WALL replied, "Uh, I don't even know." WILKERSON responded, "You don't know?" WALL then stated, "No, my motherfucking people don't got no more." I believe that during this call, WILKERSON advised WALL that he and the Pfeiffer Street drug set workers were out of CDS to sell on the drug set and WILKERSON requested that WALL re-supply them. WALL advised WILKERSON that he and his source of CDS supply did not have any CDS on hand at that time to re-supply the Pfeiffer Street drug set.

68. On or about March 16, 2015 at approximately 6:44 p.m., law enforcement intercepted a call from (856) 993-4038 (PLUMMER) to WALL FACILITY 1. During the call, PLUMMER told WALL, "I'm outside," to which WALL responded, "Alright." At approximately

6:56 p.m., pole camera surveillance captured PLUMMER's Durango pull up at 1220 Walnut Street. PLUMMER and WALL were observed exiting the vehicle and walking up to the front door of the residence. WALL then entered the residence while PLUMMER stayed on the front porch. I believe that PLUMMER picked WALL up at another location and drove him to 1220 Walnut Street to recover from WALL some or all of the $500 cash that PLUMMER had just deposited from his own funds into Tamika MILLER's account.

69. On or about March 17, 2015 at approximately 8:53 p.m., law enforcement intercepted a call from (856) 426-4380 (MILLER) to WALL FACILITY 1. During the call, MILLER asked WALL, "You call BABY BOY?," to which WALL responded "Um, nah, hell no." WALL followed up by telling MILLER, "Shit, I gave BABY BOY the other jawn, though," to which MILLER responded, "Oh alright, yeah, he told me he did tell me that." WALL then stated, "I didn't know he was in a rush or I been gave that shit to him." MILLER responded, "I mean it's cool. I need you to do it tomorrow. I told, I told whatchacallit I had text him like three four days ago told him tell you to do that that way 'cause it's, that way you know what I'm saying it won't be a problem for next time." Then MILLER stated, "Plus, I wanted you to you know what I'm saying, go ahead and get that door open for yourself, that's what I really wanted you to do." WALL then responded, "Yeah, I seen, I seen him yesterday. I was talking to him yesterday um

Boy was over there with him." I believe that WALL and MILLER

were talking about PLUMMER, and that WALL gave PLUMMER an amount

of CDS. I believe this because of PLUMMER's calls with WALL on

March 16th, when PLUMMER was relaying messages from MILLER to

deposit money into MILLER's wife's bank account. I also believe

that MILLER was talking to WALL about a supplier of the Pfeiffer

Street drug set, and that when MILLER told WALL, "get that door

open for yourself," MILLER was talking about WALL dealing with

the supplier directly, instead of through MILLER.

70. On or about March 18, 2015, at approximately 4:19 p.m., law

enforcement intercepted a call from WALL FACILITY 1 to WISE

FACILITY 1. During the call, WALL asked WISE, "You still at

work?," to which WISE replied, "Around the way." WALL then

asked "GEEZ around there, too?" to which WISE responded, "Yeah,

he down the street somewhere." WALL then asked WISE, "I thought

you needed the jawn?," to which WISE replied "I do." Later in

the call, WALL asked WISE, "DAVE still around there too?," to

which WISE responded, "Yeah, he about to leave." WALL then told

WISE, "Well, if you want that jawn, you better come get it

then," to which WISE responded, "I'll be around there in a

little bit." I believe that WISE was present on the Pfeiffer

Street drug set with MANTEZ, to whom WISE and WALL refer as

"GEEZ," and WILKERSON, to whom they refer as "DAVE." I also

believe that in the context of this call, when the speakers used

56

the term "jawn," they were referring to a quantity of CDS for WISE to pick up from WALL in order to sell that CDS on the Pfeiffer Street drug set.

71. On or about March 18, 2015 at approximately 10:17 p.m., law enforcement intercepted a call from (856) 426-4380, a number utilized by MILLER, to WALL FACILITY 1. During this call, MILLER told WALL that MILLER's Civic broke down and asked WALL to tell WISE to come pick him up. Law enforcement determined that beginning on or about March 18, 2015, MILLER did not utilize the Civic, which remained parked on a street in Camden until he brought it to a repair shop, after which he parked it at and the Gramercy Apartments housing complex, 2880 Hull Road, Camden. Between approximately March 18, 2015 and approximately May 20, 2015, pole camera surveillance captured MILLER travelling to and from the Pfeiffer Street drug set as the operator or passenger of multiple vehicles, to include rental vehicles. During these trips to the drug set, MILLER often interacted with known drug set workers. During this timeframe, MILLER did not consistently use the same vehicle.

72. On March 20, 2015, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from WALL. Prior to conducting the controlled purchase, CS-4 sent multiple text messages and placed a call, which was overheard by law enforcement, to WALL FACILITY 2 to arrange the purchase. WALL

told CS-4 to meet him by a restaurant in Camden.  At the
direction of law enforcement, CS-4 drove to the location, and at
approximately 12:45 p.m., physical surveillance observed CS-4
pull up at the location.  A few minutes later, WALL entered CS-
4's vehicle and sold CS-4 60 bags of suspected crack cocaine for
$500.

73.  On or about April 4, 2015 at approximately 6:50 p.m., pole
camera surveillance captured a silver-colored Infiniti, bearing
New Jersey Registration T13-DXX registered to Tamika MILLER (the
"silver Infiniti") arrive at the Pfeiffer Street drug set and
park.  MILLER then exited the Infiniti, walked to the sidewalk
in front of 536 Pfeiffer Street and conversed with an unknown
black male.  At this same time, a female matching the
description of Tamika MILLER exited the Infiniti's front
passenger's seat, entered Infiniti's driver's seat and departed.
A few minutes later, a dark-colored Chrysler Sport Utility
Vehicle (the "Chrysler SUV") arrived on the drug set and
stopped.  MILLER then walked over to the Chrysler SUV and
conversed with its occupant.  MILLER walked up and down the 500
block of Pfeiffer Street and then entered a residence a few
houses down from 536 Pfeiffer Street (the "residence").  At
approximately 6:57 p.m., MILLER exited the residence and walked
down to the Chrysler SUV and conversed with an occupant of the
Chrysler SUV.  MILLER then walked over to a silver-colored sedan

(the "silver sedan"), which had arrived on the Pfeiffer Street
drug set and parked while MILLER was inside the residence, and
conversed with the occupants of the silver sedan.   MILLER then
made a telephone call from a cellular telephone he produced from
his person.  At approximately the same time, law enforcement
intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2.
WALL did not answer the call.  Approximately a minute later,
MILLER made another call.  Toll analysis of WISE FACILITY 1
showed that WISE received a call from MILLER FACILITY 1 at
approximately the same time.  Approximately three minutes later,
WISE's Pontiac arrived at the Pfeiffer Street drug set and
parked.  WISE exited the driver's side of the Pontiac and
conducted a hand-to-hand transaction with an unknown white male
who exited the silver sedan.  WISE then walked over to the
Chrysler SUV and conducted a hand-to-hand transaction with an
occupant of the Chrysler SUV.  WISE then conversed with MILLER
while both were standing on Pfeiffer Street.  At approximately
7:05 p.m., MILLER and WISE entered WISE's Pontiac and departed.
I believe that MILLER called WALL because no set workers were
present at the Pfeiffer Street drug set to sell CDS to waiting
customers.  When WALL did not answer his phone, MILLER called
WISE to come to the Pfeiffer Street drug set instead.  I also
believe that WISE sold the waiting customers CDS in front of
MILLER.  I also believe that MILLER's behavior in this set of

59

events is consistent with that of a drug set owner, and WALL and WISE's behavior is consistent with that of drug set managers.

74. On or about April 6, 2015 at approximately 2:07 p.m., law enforcement intercepted a call from WILKERSON to WALL FACILITY 2. During the call, WILKERSON told WALL, "Boy, I'm, I ain't out nowhere," to which WALL responded, "Alright, here I come." At approximately 2:11 p.m., law enforcement intercepted another call from WILKERSON to WALL FACILITY 2. During the call, WILKERSON told WALL, "When you come and shit, you know how uh, FAT BOY put 'em right?" WILKERSON then added, "The same way how, what's her name, Afeesha, something like that." WALL then responded, "Who? Afeesha? They all like that," to which WILKERSON responded, "Oh alright, I'm just makin' sure." At approximately 3:12 p.m., pole camera surveillance captured WALL in front of 536 Pfeiffer Street. I believe that WALL was present on the Pfeiffer Street drug set to re-supply or "re-up" the quantity of CDS available for sale on the drug set. Specifically, on this date and time, WALL was resupplying WILKERSON, who was present on the Pfeiffer Street drug set as a set worker. I also believe that when WILKERSON said, "how uh FAT BOY put 'em" and "Afeesha," he was referring to the manner in which the CDS was prepared and packaged.

75. On or about April 7, 2015 at approximately 4:37 p.m., law enforcement intercepted a call from WALL FACILITY 2 to WISE

FACILITY 1.  During the call, WALL told WISE, "Man, you should have answered your phone, boy.  It was Altima and fuckin' another motherfucker, six jawns around here man!"  WISE asked, "Where everybody at?," to which WALL responded, "I don't know!"  WALL then told WISE, "I didn't have nothing on me either."  WALL also stated, "The jawns had them shits.  I had ten of them shits.  They went fast as hell."  WISE responded, "Hell yeah, I was in a meeting, I was ready to text you back like hold up, but I was in that meeting and couldn't even say nothing."  WALL then added, "That was an easy sixteen."  I believe that WALL was trying to contact WISE to serve customers on the set because WALL ran out of CDS.  Surveillance indicates that prior to this call, set workers waved off several customers from the set.

76.  On or about April 9, 2015 at approximately 4:44 p.m., law enforcement intercepted a call from (856) 899-8242 (MANTEZ PHONE) to WALL FACILITY 2.  During the call MANTEZ asked, "You on your way?," to which WALL responded, "You need me?"  MANTEZ then stated, "You know why I called you," to which WALL responded, "Alright I'll be around there."  At approximately 5:07 p.m., pole camera surveillance captured PLUMMER's Durango pull up on the 500 block of Pfeiffer Street.  WALL then exited the passenger side of the Durango, interacted with MANTEZ in front of 536 Pfeiffer Street, then appeared to enter 536 Pfeiffer Street.  I believe that MANTEZ was asking for WALL to

61

bring him a resupply of CDS for sale on the Pfeiffer Street drug set. I also believe that WALL, who was transported by PLUMMER, brought additional CDS to MANTEZ at 536 Pfeiffer Street.

77. On or about April 9, 2015 at approximately 7:03 p.m., law enforcement intercepted a call from (856) 426-0210, a cellular telephone utilized by PLUMMER narcotics associate R.R., to WALL FACILITY 2. During the call, R.R. told WALL "I know somebody who is selling eighty bananas for four hundred." After clarifying the amount, WALL stated, "three fifty" and "ask him if he give it to me for three fifty. Shit I know somebody gonna buy them shits." I believe that "bananas" are a quantity of CDS, and WALL was speaking to R.R. because R.R was helping WALL broker a purchase of a quantity of CDS to resell on the Pfeiffer Street drug set.

78. On or about April 10, 2015 at approximately 7:20 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2. During the call, MILLER told WALL, "GEEZ out here looking for you, bro." WALL responded, "I thought GEEZ ass was at work today," to which MILLER responded, "Nah, he right here." MILLER then told WALL, "Alright, it's cool. He's gonna wait anyway. He ain't goin' nowhere," to which WALL responded "Alright." At approximately the same time as the call, pole camera surveillance captured MILLER on the 500 block of Pfeiffer Street on the phone. WISE, MANTEZ and K.B.-1 were also observed

on the Pfeiffer Street drug set.  WISE was observed conducting a hand-to-hand transaction with an occupant of dark-colored sedan. I believe that when MILLER stated, "GEEZ out here looking for you," he was referring to MANTEZ needing WALL to bring additional CDS to "re-up" the drug set.

79.  On or about April 10, 2015 at approximately 7:36 p.m., law enforcement intercepted a call from K.B.-2 to WALL FACILITY 2. During the call, K.B.-2 told WALL, "I'm just gonna go around the way, just gonna grab two right now and I gotta go do some shit and I'm gonna come see you in like an hour and grab nine," to which WALL responded "Alright, that's cool."  At approximately 7:37 p.m., pole camera surveillance captured a black-colored Chevrolet sport utility vehicle (the "Chevrolet SUV") arrive at the Pfeiffer Street drug set and park.  MANTEZ and WISE were then observed talking to the occupant of the vehicle.  WISE then conducted a hand-to-hand transaction with the driver of the Chevrolet SUV.  The Chevrolet SUV then departed the Pfeiffer Street drug set.  At approximately 7:42 p.m., law enforcement intercepted another call from K.B.-2 to WALL FACILITY 2.  During the call, K.B.-2 told WALL, "Yo fuck, I'm coming over to see you.  There's some bullshit over there.  I'll be there in a minute," to which WALL responded, "Why, they ain't give it to you?"  K.B.-2 then stated, "No, they did.  It's just, it's just garbage."  WALL responded, "It's the same thing," to which K.B.-

2 responded, "Nah, I guarantee it ain't." WALL then told K.B.-2, "I just gave it to 'em. It's the same thing, [K.]. I'm telling you." K.B.-2 then asked, "Your shit is mushy too?," and continued, "It's not even hard, dude." WALL then asked, "who the fuck you get that from?" K.B.-2 responded, "SHEED." I believe that when K.B.-2 said he was going "around the way" for two, he was referring to going to the Pfeiffer Street drug set for a quantity of crack cocaine. I also believe that WISE, a.k.a. "SHEED," served K.B.-2 the requested amount of crack cocaine on the Pfeiffer Street drug set. I also believe that K.B.-2 called WALL to complain about the quality of the crack cocaine, and WALL explained that it was the same product that WALL presently had in his possession because WALL had previously provided that product to the set workers on the Pfeiffer Street drug set.

80.  On April 11, 2015 at approximately 11:13 a.m., law enforcement intercepted a call from WALL FACILITY 2 to WISE FACILITY 1. During the call, WALL asked, "DAVE out there?," to which WISE responded, "Yeah." WILKERSON then got onto WISE FACILITY 1 and told WALL, "Hey, that was three-sixty yesterday, too. I only owe you forty bucks." WALL responded, "Yeah, I know. Hey yo, motherfucking MONK keep trying to come out with you, man. CUZ keep telling me go ahead," to which WILKERSON responded, "Man, that's your call." At the time of the call,

pole camera surveillance captured WISE and WILKERSON in front of 536 Pfeiffer Street, and WISE was observed talking on a cellular phone. I believe that WILKERSON was discussing proceeds of drug sales on the Pfeiffer Street drug set with WALL. I also believe that WALL was telling WILKERSON that K.B.-1, a.k.a. "MONK," wanted to sell CDS on the Pfeiffer Street drug set with WILKERSON. I also believe that when WALL referred to "CUZ" telling WALL to "go ahead" and permit K.B.-1 to sell drugs on the set, WALL was referring to MILLER giving his approval, as the owner of the Pfeiffer Street drug set, for K.B.-1 to work as a Pfeiffer Street drug set worker.

81. On or about April 13, 2015 at approximately 2:09 p.m., law enforcement intercepted a call from WILKERSON to WALL FACILITY 2. During the call, WALL asked WILKERSON, "Everything good?," to which WILKERSON responded, "Yeah, nigga, holler at you." WALL then told WILKERSON, "I'm about to get dressed right now, walk around there," to which WILKERSON responded "Say no more." Before and after the call, pole camera surveillance captured WILKERSON on the 500 block of Pfeiffer Street. At approximately 2:55 p.m., pole camera surveillance captured WALL at 536 Pfeiffer Street. I believe that when WILKERSON said "Holler at you," he was asking for WALL to bring CDS to the Pfeiffer Street drug set. I also believe that WALL brought CDS to the drug set for street-level distribution.

82.  On or about April 13, 2015 at approximately 5:56 p.m., law enforcement intercepted a call from WALL FACILITY 2 to WISE FACILITY 1.  During the call, WALL asked, "Where the fuck you at?  Around the way?," to which WISE responded, "No, I just left from around there."  WALL then asked, "Who around there?," to which WISE responded, "GEEZ."  I believe that WISE and WALL were referring to the Pfeiffer Street drug set when they say "around the way."  I also believe that the conversation between WALL and WISE is consistent with two managers of a drug set ensuring that there are workers on the set.  I also believe that at the time of this call, WISE had confirmed to WALL that MANTEZ, a.k.a. "GEEZ," was working as a set worker on the Pfeiffer Street drug set.  MANTEZ' presence on the set during this period was confirmed by surveillance.

83.  On or about April 13, 2015 at approximately 10:52 p.m., law enforcement intercepted a call from K.B.-2 to WALL FACILITY 2. During the call, K.B.-2 asked WALL, "You at home?," to which WALL responded, "Yeah, I'm out East."  Later in the call, K.B.-2 stated, "I'll be there in like ten minutes.  Can you have me?  I need a seven," to which WALL responded, "Alright."  At approximately 10:57 p.m., law enforcement intercepted another call from K.B.-2 to WALL FACILITY 2.  During the call, K.B.-2 told WALL, "Yo, I'm back here."  After a brief exchange about K.B.-2 giving WALL a ride, WALL asked, "How many did you want

66

again?," to which K.B.-2 responded, "Seven."  I believe that
K.B.-2 was asking WALL for a particular amount of CDS, and that
WALL provided the CDS when K.B.-2 arrived.

84.  On or about April 17, 2015, utilizing CS-4, law enforcement
conducted a controlled purchase of crack cocaine from WALL.
Prior to conducting the controlled purchase, CS-4 exchanged
multiple text messages with WALL and placed a call, which was
overheard by law enforcement, to WALL FACILITY 2 to arrange the
purchase.  During these contacts, WALL told CS-4 to meet him at
a location near a business in Camden.  At the direction of law
enforcement, CS-4 drove to that meeting location during the
afternoon hours.  Physical surveillance captured CS-4 arriving
at the meeting location.  Approximately a few minutes later,
WALL entered CS-4's vehicle and sold CS-4 58 bags of suspected
crack cocaine in exchange for $500.

85.  On April 20, 2015 at approximately 1:20 p.m., law
enforcement intercepted a call from WILKERSON to WALL FACILITY
2.  During the call, WILKERSON told WALL, "You could, you could
slide through.  You, uh yeah, come, come through," to which WALL
responded, "Okay."  At approximately the same time as the call,
pole camera surveillance captured WILKERSON on the 500 block of
Pfeiffer Street.  At approximately 2:30 p.m., law enforcement
intercepted a call from WILKERSON to WALL FACILITY 2.  During
the call, WILKERSON asked, "Man, where you at?  You fucking

around?"  WALL responded, "I'm around the corner, nigger."
WILKERSON then stated, "People just left me," and "They said you
was taking too long."  After a brief exchange, WALL stated, "I'm
walking now."  Approximately two minutes later, pole camera
surveillance captured WALL walking onto the 500 block of
Pfeiffer Street toward WILKERSON, who was already on the drug
set.  WALL was then observed walking up to WILKERSON and handing
WILKERSON a plastic bag behind his back.  WILKERSON then walked
over to three different customers waiting on the drug set and
conducted hand-to-hand transactions with them.  I believe that
WILKERSON was asking WALL to come to the Pfeiffer Street drug
set to resupply the drug set.  I also believe that WALL handed
WILKERSON a bag of crack cocaine packaged for street-level
distribution, which WILKERSON then used to serve customers
waiting for WALL's arrival.

86.  On or about April 24, 2015 at approximately 5:41 p.m.,
MILLER was observed on pole camera surveillance to be present at
the Pfeiffer Street drug set.  Shortly thereafter, MILLER was
observed walking out of the pole camera's view.  At
approximately 7:18 p.m., MILLER, WALL, WISE and V.R. arrived on
the Pfeiffer Street drug set in WISE's Pontiac.  MILLER was
driving the Pontiac on this occasion.  At this time, a white
2004 Nissan minivan, Pennsylvania registration JTD-0022 (the
"Nissan minivan") was already present at the Pfeiffer Street

drug set and was parked on the side of Pfeiffer Street.  MILLER,
WALL, WISE and V.R. exited WISE's Pontiac.  The driver of the
Nissan minivan exited the Nissan minivan, walked toward WISE's
Pontiac carrying what appeared to be a letter or legal-sized
manila envelope, greeted WISE and MILLER and conversed briefly
with both before handing MILLER the manila envelope.  MILLER
took the manila envelope and locked it in the trunk of WISE's
Pontiac.  At approximately 8:25 p.m., an unidentified female
arrived on the Pfeiffer Street drug set in a tan-colored Buick,
New York registration GSC-8586 (the "Buick")[11] and parked.  The
unidentified female exited the Buick, entered an unknown
vehicle, and departed the Pfeiffer Street drug set.  MILLER
removed the manila envelope from the trunk of the green Pontiac
and transferred the manila envelope to the interior of the
Buick.  MILLER then departed the Pfeiffer Street drug set
driving the Buick.

87.  On or about April 26, 2015 at approximately 3:31 p.m., law
enforcement intercepted a call from MILLER FACILITY 1 to WALL
FACILITY 2.  During the call, MILLER told WALL, "I'm ready to
take a ride with FAT BOY, so, so, so I'll be down there in a

---

[11] Investigation determined that the Buick is a rental vehicle.  Based
on pole camera surveillance, physical surveillance, law enforcement
database searches, and motor vehicle record inquiries, I believe that
beginning on or about April 24, 2015, MILLER began driving the Buick.
On or about April 25, 2015, law enforcement officers observed the
Buick parked outside of MILLER's residence.  On or about April 28,
2015, MILLER was captured on pole camera surveillance operating the
Buick on the Pfeiffer Street drug set.

little bit.  Around like, uh, a half.  I'll come over there and grab you."  At approximately 5:13 p.m., pole camera surveillance captured the Buick pull up on the 500 block of Pfeiffer Street. MILLER then exited the driver's seat and conversed with WALL and WILKERSON on the sidewalk.  At approximately 5:16 p.m., law enforcement intercepted a call from WALL FACILITY 2 to WISE FACILITY 1.  At the time of the call, pole camera surveillance captured WALL on Pfeiffer Street talking on a cellular phone with MILLER and WILKERSON in the background.  During the call, WALL asked, "Where you at?," to which WISE responded, "Crib." WALL then asked, "You had that with you?," to which WISE responded, "Yeah."  A voice in the background believed to be MILLER's can be heard saying, "Tell him we coming right now. Fuck he at?"  WALL then asked WISE, "The whole thing?," to which WISE responded, "Yeah."  At approximately 5:18 p.m., pole camera surveillance captured WALL and MILLER entering the Buick and departing.  Law enforcement conducting physical surveillance observed the Buick drive to WISE's residence, located at 11 Dudley Street, Camden.  WISE was then observed exiting 11 Dudley Street and entering his Pontiac.  Law enforcement then observed the Buick and the Pontiac drive to a 7 Eleven store, located at the corner on Marlton Pike and Federal Street in Camden.  WISE was then observed entering the 7 Eleven and exiting a short time later with what appeared to be U.S. currency in his hand.  WISE

70

then entered the rear passenger seat of the Buick.  After a short time, WISE exited the Buick, entered the Pontiac and both vehicles departed.  At approximately 5:37 p.m., pole camera surveillance captured the Buick pulling up on the 500 block of Pfeiffer Street.  After a few minutes, WALL exited the vehicle and the Buick departed.  WISE was then observed walking up to the 500 block of Pfeiffer Street from his vehicle, which was parked on the other side of the street.  At approximately 5:55 p.m., pole camera surveillance captured WISE conducting a hand-to-hand transaction with the occupants of a maroon-colored sedan.  I believe that MILLER was collecting proceeds of CDS sales from WISE and WALL on this occasion.

88.  On or about April 27, 2015 at approximately 6:25 p.m., law enforcement intercepted a call from (856) 899-8242 (MANTEZ) to WALL FACILITY 2.  During the call, WALL told MANTEZ, "Ain't shit," to which MANTEZ responded, "Nah?"  WALL then stated, "Hell no," to which MANTEZ replied, "Damn, yo, let me know."  I believe that MANTEZ was calling WALL to see if WALL had any CDS to sell on the Pfeiffer Street drug set.

89.  On or about April 27, 2015 at approximately 6:32 p.m., law enforcement intercepted a call from WALL FACILITY 2 to (856) 993-4038 (PLUMMER).  During the call, WALL told PLUMMER, "I thought you had something."  PLUMMER then stated, "Like what?," and then asked "Some weed?"  WALL then responded, "No, man," to

71

which PLUMMER responded, "Oh yeah, you know I got that, you know I got that." WALL then told PLUMMER, "I don't know where OLD BOY," then stated, "I'm waiting for him. He ain't answer his phone tonight." PLUMMER then asked "Who? CUZ?," to which WALL responded "Yeah." WALL went on to say, "I give him a jawn, but he ain't answer his phone though." I believe that WALL was complaining to PLUMMER about not having CDS. I also believe that when PLUMMER told WALL, "You know I got that," he was telling WALL that he had CDS. I also believe that WALL was waiting to hear from MILLER, a.k.a. "CUZ," regarding additional CDS.

90. On or about April 27, 2015 at approximately 7:41 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2. During the call, MILLER asked, "Did you ever get wit whatchacall it?," then clarified by saying, "DAVE." WALL stated, "He wasn't ready yet though," to which MILLER responded, "How about the one he, the one he had already?" WALL then stated "Yeah, the first. Yeah, the first one. Yeah, it's almost there. It's there though." MILLER responded, "Aight, tell him don't leave though, 'cause I need to talk to him," to which WALL replied, "Yeah, he look for you, too, about the other thing." I believe that WILKERSON, a.k.a. "DAVE," was preparing a certain amount of CDS for street-level distribution and MILLER was asking if he was done yet.

91. On or about April 27, 2015 at approximately 9:40 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2. During the call, MILLER asked WALL, "Yo GOTTI, where you at?" WALL stated, "Around the way nigga," to which MILLER responded, "I know, I got caught up. I'm on my way right now." At approximately 9:56 p.m., pole camera surveillance captured a light-colored sedan pull up in front of 536 Pfeiffer Street, an individual walk down the walkway from the direction of 536 Pfeiffer Street and enter the vehicle. The vehicle was then observed backing up and parking in the vicinity of 564 Pfeiffer Street, a residence known to be frequented by WILKERSON. An individual was then observed walking to the vehicle from the direction of 562 Pfeiffer Street and entering the vehicle. The vehicle then departed. I believe that when WALL said he was "around the way," he was referring to being on the Pfeiffer Street drug set. I also believe that MILLER picked up WALL from 536 Pfeiffer Street, and picked up WILKERSON from 562 Pfeiffer Street, in order to pick up or pay for CDS being prepared by WILKERSON.

92. On or about April 28, 2015 at approximately 12:31 p.m., law enforcement intercepted a call from WALL FACILITY 2 to WILKERSON. During the call, WILKERSON asked, "I'm around and shit. I needed uh, I need this whatsername from you," to which WALL responded, "Alright, here I come." I believe that

73

WILKERSON asked WALL to resupply the Pfeiffer Street drug set with CDS.

93. On or about April 28, 2015 at approximately 12:34 p.m., law enforcement intercepted a call from WILKERSON to WALL FACILITY 2. During the call, WILKERSON told WALL, "Yeah, nah, hold, hold up on that 'cause uh, motherfucking um, JB just called me. He said he had went to go walk around the Lukoil and shit. He said he seen, uh, seven cars, three unmarked, a regular state, all, uh, Sheriff, like all this crazy shit but just, just wait for a few minutes. I'll call you. I don't want you walking and these niggas be on some bullshit." I believe that WILKERSON was warning WALL not to walk with CDS because of the police presence in the area.

94. On or about April 28, 2015 at approximately 12:43 p.m., law enforcement intercepted a call from WILKERSON to WALL FACILITY 2. During the call, WILKERSON told WALL, "You good, that's Parole," to which WALL responded, "Alright." I believe WILKERSON was telling WALL that WALL was safe from law enforcement interference.

95. On or about April 28, 2015 at approximately 1:20 p.m., pole camera surveillance captured WALL walking onto to 500 block of Pfeiffer Street and conversing with WILKERSON. I believe that WALL came to the Pfeiffer Street drug set to bring CDS to WILKERSON to sell on the set.

74

96.  On or about April 28, 2015 at approximately 3:08 p.m., pole camera surveillance captured MILLER arrive at the Pfeiffer Street drug set in the Buick and park.  MILLER was driving the Buick and there was an unknown male front seat passenger. WILKERSON approached the Buick and conversed with MILLER. WILKERSON then entered the rear passenger seat of the Buick and the Buick departed.

97.  On April 28, 2015 at approximately 3:29 p.m., law enforcement intercepted a telephone call from K.B.-2 to WALL FACILITY 2.  During this intercepted communication, K.B.-2 asked WALL if he was "good."  WALL confirmed that he was "good." K.B.-2 then advised that he needed "eight."   WALL and K.B.-2 arranged for K.B.-2 to meet WALL "out East," but not "around the way."  At approximately 3:38 p.m., pole camera surveillance captured K.B.-2 and WALL as they arrived on the Pfeiffer Street drug set in K.B.-2' Chevrolet SUV.  WALL exited the front passenger seat of the Chevrolet SUV.  K.B.-2 remained in the driver's seat.  At approximately 3:39 p.m., MILLER and WILKERSON returned to the Pfeiffer Street drug set in the Buick. WILKERSON exited the Buick and approached the Chevrolet SUV. WALL said something to WILKERSON and in response, WILKERSON turned around and walked in the direction of 564 Pfeiffer Street, along with WALL and MILLER, who had exited the driver's seat of the Buick.  Approximately five minutes later, WILKERSON

returned to the Chevrolet SUV and conducted a hand-to-hand transaction with K.B.-2.  I believe that K.B.-2 called WALL to purchase a quantity of CDS and asked WALL if he had CDS to sell. WALL confirmed to K.B.-2 that WALL had CDS to sell K.B.-2.  I further believe that, at this time, MILLER and WILKERSON were in the process of obtaining a re-supply of CDS for sale on the Pfeiffer Street drug set and when MILLER and WILKERSON returned to the Pfeiffer Street drug set, they were in possession of that supply of CDS.  I also believe that K.B.-2 traveled to the Pfeiffer Street drug set with WALL in order to purchase CDS.  I believe that the residence of 564 Pfeiffer Street was being utilized as a storage or "stash" location for the Pfeiffer Street drug set.  I believe that MILLER traveled to 564 Pfeiffer Street on this date to deliver the re-supply of CDS for sale on the Pfeiffer Street drug set.

98.  On or about April 28, 2015 at approximately 5:05 p.m., law enforcement intercepted a call from Pfeiffer Street drug set worker V.R. to WALL FACILITY 2.  During the call, V.R. asked, "No, no good news?," to which WALL responded, "Yeah, go around there."  V.R. then asked, "Alright, who around there?  Oh, somebody got it?," to which WALL responded, "Yeah."  At approximately 5:32 p.m., pole camera surveillance captured V.R. walking onto the 500 block of Pfeiffer Street, dropping a backpack inside of WISE's Pontiac and entering 536 Pfeiffer

Street.  At approximately 7:10 p.m., V.R. was observed walking
from 536 Pfeiffer Street to the street and conducting a hand-to-
hand transaction with a dark-colored BMW.  I believe that when
V.R. asked whether there was "good news," he was referring to
whether WALL had CDS to sell on the Pfeiffer Street drug set.  I
also believe that WALL informed V.R. that he did have CDS, which
prompted V.R. to travel to the 500 block of Pfeiffer Street.
Lastly, I believe that V.R. sold CDS to the occupant of the
dark-colored BMW.

**99.**  On or about April 30, 2015 at approximately 4:30 p.m., law
enforcement intercepted a call from (856) 993-4038 (PLUMMER) to
WALL FACILITY 2.  During the call, PLUMMER stated, "Hey yo, tell
CUZZO call this fuckin' nigga, man.  This nigga keep blowing my
fuckin phone up, yo!," to which WALL responded, "Oh [sounds
like] BULL?"  PLUMMER responded "Yeah, fuckin nigger POP-POP
man," to which WALL responded, "What, you suppose to give him
something?"  PLUMMER responded, "I don't have no idea.  It gotta
be CUZ.  He don't never, he don't blow your phone up like blow
my shit up like that unless somebody owe him a few ones."  WALL
then stated, "I'm a tell him when he come back around.  He just
left from around here."  PLUMMER stated, "Hell yeah, this nigga
keep calling.  Fuck you keep callin' for, man?  He'll get with
you.  Act like somebody gonna fuckin' run and keep his shit."  I
believe that PLUMMER was asking WALL to tell MILLER to contact

"POP-POP," a known DTO associate identified by the investigation as A.J., regarding a CDS transaction. I also believe that when PLUMMER said "ones," he was referring to a quantity of CDS.

100. On or about May 4, 2015 at approximately 4:55 p.m. pole camera surveillance captured MILLER and several other males present on the Pfeiffer Street drug set. MILLER and two other males were gathered around the Nissan minivan while one of the males repaired the minivan. At approximately 4:55 p.m., the silver Infiniti arrived at the Pfeiffer Street drug set and parked on the side of Pfeiffer Street. At approximately 5:00 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WISE FACILITY 1, while MILLER was present on the Pfeiffer Street drug set and was captured by pole camera surveillance speaking on a cellular telephone. During this call MILLER asked WISE, "How long before you come around here?" WISE replied that he was purchasing brakes for his vehicle and planned to arrive at the Pfeiffer Street drug set in "probably like another five minutes, ten minutes" to get the brakes on his car fixed by the male who was at that time repairing the Nissan minivan. MILLER asked WISE who was "fixing [WISE's] shit?" WISE gave MILLER the name of the individual whom he believed would repair the brakes on his vehicle, but the name of that individual was unintelligible. MILLER told WISE that the individual was "right here," and was "fixing GITTY's shit." WISE again advised MILLER

that he would come to the Pfeiffer Street drug set in approximately five or ten minutes and MILLER replied, "Alright." At the time of this intercepted communication, none of the previously-identified Pfeiffer Street drug set workers were present on the Pfeiffer Street drug set.  I believe that MILLER placed this call to WISE to ensure that someone would be present at the Pfeiffer Street drug set to sell CDS to potential CDS customers because MILLER was going to depart the Pfeiffer Street drug set in the silver Infiniti, which law enforcement believes was driven by MILLER's wife, Tamika MILLER.

101. At approximately 5:02 p.m. on May 4, 2015, law enforcement intercepted a call from MILLER FACILITY 1 to WISE FACILITY 1 while MILLER was still present on the Pfeiffer Street drug set and captured on pole camera surveillance talking on a cellular telephone.  MILLER advised WISE that "GIT is going to be waiting on you for me," and that GIT would have "thirty bucks" for WISE. WISE told MILLER, "Alright."  I believe that MILLER placed this call to WISE to advise him that MILLER would be leaving money intended for WISE with someone else on the drug set because MILLER intended to depart the Pfeiffer Street drug set in the silver Infiniti before WISE was going to arrive there.  Pole camera surveillance captured MILLER as he departed the Pfeiffer

Street drug set in the silver Infiniti at approximately 5:06 p.m.

102. On or about May 4, 2015 at approximately 6:46 p.m., law enforcement intercepted a call from (856) 993-4038 (PLUMMER) to WALL FACILITY 2.  During the call, WALL stated, "I was gonna see if you had motherfucker, uh, you had a little something?" PLUMMER replied, "Yeah, who me?," to which WALL responded, "Yeah."  PLUMMER then stated, "Yeah," to which WALL asked, "You want me to come past there and see you?"  PLUMMER stated, "Yeah, uh, uh, yeah, as soon as you come just come see me or call my phone and see where I'm at."  I believe that WALL was asking PLUMMER if PLUMMER had CDS, which PLUMMER confirmed he did.  I also believe that WALL was going to see PLUMMER to obtain CDS from him for street-level distribution on the Pfeiffer Street drug set.

103. On or about May 6, 2015 at approximately 5:14 p.m., pole camera surveillance captured MILLER walk onto the Pfeiffer Street drug set.  At approximately 5:25 p.m., MILLER, WISE and WILKERSON walked west on Pfeiffer Street and turned south on Thorndyke Street.  At approximately 6:05 p.m., MILLER, WISE and WILKERSON returned to the Pfeiffer Street drug set.  MILLER entered 536 Pfeiffer Street carrying a black plastic bag.  At approximately 6:32 p.m., law enforcement intercepted a call from

MILLER FACILITY 1 to WALL FACILITY 1.  During the call, MILLER asked WALL, "You at the crib?," to which WALL responded, "Yeah." MILLER then told WALL, "I might need to come up there real quick.  I'm, SHEED to bring me up there."  During the call, pole camera surveillance captured MILLER using a cellular phone in front of 536 Pfeiffer Street.  After the call, MILLER entered 536 Pfeiffer Street again.  At approximately 6:37 p.m., MILLER was observed walking from 536 Pfeiffer Street carrying the black plastic bag as WISE followed behind.  MILLER and WISE then entered WISE's Pontiac and departed.  Physical surveillance units observed WISE's Pontiac as it parked in an alley in the rear of a residence at 2664 Berkley Street in Camden ("2664 Berkley Street").  2664 Berkley Street is the residence of one of WALL's girlfriends.

104. On or about May 6, 2015, at approximately 6:45 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2.  During the call, MILLER told WALL, "Yo, just pulled up out back."  At approximately 6:48 p.m., physical surveillance units observed WISE's Pontiac drive out of the alley behind 2664 Berkley Street and depart.  I believe that MILLER and WISE met WALL at 2664 Berkley Street in order to provide CDS to WALL or collect proceeds of CDS sales on the Pfeiffer Street drug set from WALL.

105. On May 18, 2015 at approximately 1:40 p.m., pole camera
surveillance captured MILLER arriving at the Pfeiffer Street
drug set in a newer model red-colored Chevrolet sedan.   MILLER
was observed first walking to the front area of 536 Pfeiffer
Street and then walking in the direction of 564 Pfeiffer Street.
MILLER then met with WILKERSON.   During their meeting, pole
camera surveillance captured WILKERSON handing something to
MILLER.   The item WILKERSON handed to MILLER was consistent with
United States currency.

106. On May 18, 2015 at approximately 7:41 p.m., law enforcement
intercepted a telephone call between MILLER and an unidentified
female.   During this call, the unidentified female conducted a
"three-way call" with a male, later identified as J.S., on a
different telephone.   It was apparent during this call that J.S.
was located at a correctional facility.   During this "three-way
call," MILLER and J.S. discussed MILLER's use of the
unidentified male's vehicle while J.S. was incarcerated.   During
this conversation, MILLER told J.S. that he had been using
rental vehicles.   J.S. told MILLER that MILLER could use J.S.'
vehicle and that MILLER could leave the insurance for the
vehicle in J.S.' name.   MILLER agreed to pay for the insurance
while he used the vehicle.   During this conversation, MILLER
told J.S. that he was going to return the rental vehicle and
come get J.S.' vehicle.

107. On May 19, 2015, a gold-colored Chrysler 300, New Jersey Registration F29-CAC (the "Chrysler 300") was observed by law enforcement parked at the Saint Joseph's Carpenter Society, located at 555 Atlantic Avenue, Camden. This is a known place of employment for MILLER. New Jersey Registration F29-CAC is for a 2000 Chrysler 300, registered to J.S. at an address in Gloucester, New Jersey. Investigation confirmed that J.S. was incarcerated at that time in a New Jersey Department of Corrections facility, having been convicted of illegally possessing a handgun.

108. On or about May 20, 2015 at approximately 11:52 a.m., pole camera captured WISE's Pontiac pull up on the 500 block of Pfeiffer Street. At approximately 11:54 a.m., law enforcement intercepted a call from WISE FACILITY 1 to (856) 899-8242 (MANTEZ). During the call, MANTEZ asked WISE for a ride, to which WISE responded, "I can't even pull off. Metro's sitting right here." At approximately 11:54 a.m., pole camera surveillance captured WISE exiting the Pontiac and entering 536 Pfeiffer Street. At approximately 11:56 a.m., law enforcement captured a call from WILKERSON to WISE FACILITY 1. During the call, WILKERSON told WISE, "Metro blowin' my shit. Call me when they leave," to which WISE responded, "Alright, I can't even pull back off. I'm like yo how they just blew my shit." At approximately 12:01 p.m., pole camera surveillance captured a

Camden County Police Department – Metro unit driving through the Pfeiffer Street drug set. At approximately 12:05 p.m., MILLER's Chrysler 300 pulled up on the Pfeiffer Street drug set. Based on previous intercepted calls and physical surveillance, I believe that MILLER was driving the vehicle. At approximately 12:06 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2. The call was unanswered, but MILLER can be heard in the background saying, "I'll be back." At approximately 12:07 p.m., the Chrysler 300 departed, heading west on Pfeiffer Street. At approximately the same time, law enforcement intercepted a call from MILLER FACILITY 1 to WISE FACILITY 2. During the call, MILLER told WISE, "He pulled off" and "He ain't there no more. I ain't seen them up the strip nowhere's so, but he definitely pulled off." I believe that MILLER, WISE and WILKERSON were all referring to Camden County Police Department - Metro units that were on and around Pfeiffer Street. I also believe that when WILKERSON and WALL said "blowing my shit," they were referring to the police presence interfering with their ability to sell CDS on the drug set. I also believe that MILLER informed WISE that police had left the area, so that they could continue to sell CDS on the Pfeiffer Street drug set.

109. On or about May 21, 2015 at approximately 11:09 a.m., law enforcement intercepted a call over MILLER FACILITY 1 from

MILLER to WILKERSON.  MILLER told WILKERSON that, "I'm a breeze through right now."  At Approximately 11:21 a.m., pole camera surveillance captured MILLER's Chrysler 300 arriving on the Pfeiffer Street drug set.  WILKERSON was observed entering the front passenger seat and remaining in the vehicle for approximately 90 seconds.  WILKERSON then exited the Chrysler 300, which departed.  I believe that MILLER traveled to the Pfeiffer Street drug set to see WILKERSON to collect a portion of the proceeds of CDS sales on the Pfeiffer Street drug set, as he is entitled to do as the owner of the drug set.

110.  On or about May 21, 2015, utilizing CS-4, law enforcement conducted a controlled purchase of crack cocaine from WILKERSON.  At the direction of law enforcement, CS-4 drove to the Pfeiffer Street drug set, and surveillance observed CS-4 arriving at the Pfeiffer Street drug set at approximately 11:51 a.m.  WILKERSON walked up to the front passenger window of CS-4's vehicle.  After a brief conversation, WILKERSON walked towards 564 Pfeiffer Street.  WILKERSON then returned to CS-4's vehicle and sold CS-4 12 bags of suspected crack cocaine in exchange for $100.  This quantity consisted of 10 ten-dollar bags of crack cocaine, plus two free bags of crack cocaine as a "bonus."  During the transaction, WILKERSON provided CS-4 with his cellular phone number, (856) 426-0933, a number previously identified by law enforcement as WILKERSON's.  CS-4 then

departed, and WILKERSON walked back in the direction of 564 Pfeiffer Street.

111. On or about May 21, 2015 at approximately 12:04 p.m., law enforcement intercepted a text message from WILKERSON to MILLER which stated, "Slide through."  At approximately 2:05 p.m., law enforcement intercepted a call over MILLER FACILITY 1 from MILLER to WILKERSON.  During the call, MILLER told WILKERSON, "I'm ready to come right down there."  At approximately 2:11 p.m., pole camera surveillance captured the Chrysler 300 arriving on the Pfeiffer Street drug set.  WILKERSON entered the Chrysler 300's front passenger seat and remained in the car for approximately one minute.  WILKERSON then exited the vehicle and the Chrysler 300 departed.  Approximately one minute later, law enforcement intercepted a call from MILLER to an unknown male. MILLER told the unknown male, "yeah I got it," and "be there in like two minutes."  Later that day, at approximately 5:57 p.m., pole camera surveillance captured MILLER's Chrysler 300 returning to the Pfeiffer Street drug set.  At approximately the same time, law enforcement intercepted a call from MILLER FACILITY 1 to WILKERSON.  During the call, MILLER asked WILKERSON, "Yo, you in the crib right there?," to which WILKERSON responded, "Yeah."  MILLER then stated, "Come on out." I believe that following the transaction with CS-4, WILKERSON had additional proceeds to provide to MILLER, which prompted his

text to MILLER advising him to "Slide through."   MILLER, who was
driving the Chrysler 300, met with WILKERSON to pick up proceeds
of CDS sales on both occasions.

112. On or about May 22, 2015 at approximately 3:58 p.m., pole
camera surveillance captured the Chrysler 300 arriving on the
500 block of Pfeiffer Street.   MILLER was observed to be the
driver of the Chrysler 300.   MILLER spent approximately 30
minutes meeting with a group of people, including WILKERSON.
WALL and MANTEZ were also present on the set.   At approximately
5:22 p.m., the Chrysler 300 returned to the 500 block of
Pfeiffer Street and pulled up next to WISE's Pontiac.   WISE was
observed walking up to the Chrysler 300's driver's window and
handing what appeared to be United States currency to the driver
of the Chrysler 300.   I believe that MILLER traveled to the
Pfeiffer Street drug set to collect a portion of the proceeds of
CDS sales from the Pfeiffer Street drug set.

113. On or about May 22, 2015 at approximately 8:12 p.m., law
enforcement intercepted a call from WALL FACILITY 1 to (856)
993-4038 (PLUMMER).   During the call, WALL stated to PLUMMER,
"What's up with that move?   You ain't ever bust it?," then
clarified, "That motherfucking shit you was looking for."
PLUMMER then replied, "Oh yeah, yeah, yeah," to which WALL
asked, "It was straight?"   PLUMMER responded, "Yeah, it was
straight."   WALL then stated, "Yeah, I'm a motherfucking hit

your phone as soon as I wake up tomorrow," and "Alright, I'm a uh, I want one those motherfucking little jawns like last time." PLUMMER then acknowledged the request, stating "Alright." I believe that WALL was asking PLUMMER for CDS. I also believe that his request for CDS was similar to a previous order that PLUMMER had fulfilled in the past.

114. On or about May 23, 2015 at approximately 9:43 a.m., law enforcement intercepted a call over MILLER FACILITY 1 between MILLER and an unknown male. During this call, MILLER asked the unknown male if he was around yet because he definitely needed him. The unknown male said that he was "out back right now."

115. On or about May 23, 2015 at approximately 9:48 a.m., law enforcement intercepted a call from MILLER FACILITY 1 to WILKERSON. During the call, MILLER asked, "What time you coming out?," to which WILKERSON responded, "I'll probably be out there like eleven." MILLER then stated, "Alright, that's cool. I want to get up with you."

116. On or about May 23, 2015 at approximately 11:07 a.m., law enforcement intercepted a call over MILLER FACILITY 1 between MILLER and an unknown male (a different unknown male from the 9:43 a.m. call). During this call, MILLER and this second unknown male arranged to meet.

117. At approximately 11:08 a.m. on May 23, 2015, law enforcement intercepted a call from WILKERSON to MILLER FACILITY 1.  During the call, WILKERSON told MILLER, "I'm around."

118. At approximately 11:31 a.m. on May 23, 2015, law enforcement intercepted another call between MILLER and the second unknown male.  MILLER and the unknown male agreed to meet at the unknown male's "crib."  At approximately 11:36 a.m., law enforcement surveillance observed MILLER operating the Chrysler 300 in a residential area of Camden.  Approximately one minute later, surveillance observed the Chrysler 300 parked next to another vehicle on Jackson Street in Camden.  At approximately 11:44 a.m., law enforcement surveillance observed this other vehicle following the Chrysler 300.  Law enforcement was unable to maintain continuous surveillance on the Chrysler 300.

119. At approximately 11:58 a.m. on May 23, 2015, pole camera surveillance captured MILLER's Chrysler 300 pull up on the 500 block of Pfeiffer Street.  WILKERSON was then observed entering the Chrysler 300, which then parked on the north side of the street.  At approximately 12:01 p.m., MILLER and WILKERSON exited the Chrysler 300 and walked toward 564 Pfeiffer Street. At approximately 12:04 p.m., MILLER and an unknown male suspected by law enforcement to be V.R., entered the Chrysler 300 and departed.  I believe that when MILLER told WILKERSON, "I need to get up with you," he was referring to picking up

proceeds of CDS sales from WILKERSON.  I also believe that once
WILKERSON informed MILLER that he was on the Pfeiffer Street
drug set, MILLER met with WILKERSON and picked up proceeds.

120. On or about May 24, 2015 at approximately 9:47 a.m., law
enforcement surveillance observed the Chrysler 300 parked at
MILLER's residence at the White Oak Lane Apartments, located at
1029 Main Street, Mantua Township, New Jersey, 08051.

121. On or about May 24, 2015 at approximately 11:45 p.m., law
enforcement intercepted a call to MILLER FACILITY 1 from an
unidentified male.  During the call, the unidentified male asked
MILLER, "You got something for me?," to which MILLER responded,
"Yeah, I got one right on the table for you.  Tell BOO to give
it to you."  MILLER then stated, "Tell him to give you one."  I
believe that the unidentified male was asking for an amount of
CDS, and that MILLER sent him to see WALL, a.k.a. "BOO," to pick
it up.

122. On or about May 27, 2015 at approximately 4:29 p.m., law
enforcement intercepted a call from (856) 993-4038 (PLUMMER) to
MILLER FACILITY 1.  During the call, PLUMMER told MILLER, "Nah,
I told you, I had little, little LD, I had got with little LD.
I had just called FAT BOY.  He said yeah.  He said he need it,"
to which MILLER responded, "Alright."  PLUMMER then stated, "So,
but I, we don't have no ride, so I told him call see where you
was at."  MILLER then responded, "Who, who, who, SHAWN ain't got

no ride either," to which PLUMMER stated, "Nah, he ain't got no ride. All we, all you got to do is come out Parkside though really. He sayin' he ain't got no ride but I, I, I, I'm with CHAR right now. As soon I get done doing what I'm doing I'm gonna see if RAYMOND come through and I'll just snatch FAT BOY up and we'll go get it." MILLER then stated, "Shit. He, he, he, let me call him 'cause I'm sitting at the job." PLUMMER then told MILLER, "You can just, 'cause he, you know he gonna come right out to MISSY's." MILLER asked, "He gotta go run around and all that or he gonna be good already?" PLUMMER then responded, "Nah, he had it with him, he had it with him. That's why I'm like, damn. Let me make the call right now. You feel me, 'cause I said something to him but he came to see me. He had it with him." MILLER then told PLUMMER, "Alright, let me, let me, let me do it right now. I'll call you right back." I believe that PLUMMER met with an unknown individual, only known as "LD," and immediately contacted an individual, only known as "FAT BOY," and "FAT BOY" advised that he was in need of whatever CDS or unidentified item PLUMMER was able to obtain from "LD." I further believe that PLUMMER was setting up a meeting to conduct a CDS transaction and/or transaction of an unidentified item between "LD" and "FAT BOY." PLUMMER then advised MILLER that "he" didn't have a ride, to which MILLER asked if "SHAWN" was the individual in need of a ride. I believe that "SHAWN" is

91

"FAT BOY," whom the investigation has identified as S.W., a DTO narcotics associate.  It is further believed that PLUMMER advised MILLER that "SHAWN," a.k.a. "FAT BOY," didn't have a ride and was advising MILLER to call "SHAWN" to pick him up and drive to the Parkside neighborhood of Camden to meet with PLUMMER.  I further believe that when PLUMMER was finished with "CHAR" (Chardae WALL PLUMMER, PLUMMER's wife), he was going to contact an individual, only identified as "RAYMOND," to see if "RAYMOND" could meet with them; that he would pick up "FAT BOY;" and that they would all go pick up the CDS and/or unidentified item from "LD."  I believe that PLUMMER was going to contact his cousin "RAYMOND," and have him present during the transaction. I believe that the meeting would take place at 1220 Walnut Street in Camden owing to PLUMMER advising MILLER to come out to "MISSY's."  Law enforcement has determined that the residence at 1220 Walnut Street, Camden is owned by Melissa "MISSY" WALL. Melissa "MISSY" WALL is the mother of Rodney WALL and Chardae WALL PLUMMER, who is PLUMMER's wife.

**123.** On or about May 27, 2015, at approximately 4:30 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to a cellular telephone utilized by a DTO associate, S.W.  During the call, MILLER told S.W., "What you wanna do?," to which S.W. replied, "Uh, where you at?"  MILLER responded, "I'm at the job."  S.W. then stated, "Uh, what you doing?," to which MILLER

replied, "Yeah, hell yeah."  S.W. then told MILLER,

"[unintelligible] for that number everything is you know what I

mean."  MILLER then stated, "You good, cuz, you definitely good,

I already know who it is I know who it is, it's good, trust me."

S.W. responded, "Alright um, you, you wanna come get me, or what

you want to do?," to which MILLER responded, "Come here real

quick, hurry up, you got to hurry up."  Later during the call,

S.W. stated, "Yeah man, I'm, I'm going to come down there now."

I believe that MILLER placed a call to S.W. to ask him if he was

interested in conducting the transaction for CDS and/or an

unidentified item.  Law enforcement further believes that S.W.

was concerned with the price of the CDS and/or unidentified

item, but MILLER reassured S.W. because MILLER knew the

individual who was selling the CDS and/or unidentified item.

124. On or about May 27, 2015 at approximately 4:35 p.m.,

physical surveillance was conducted in the area of South 6th

Street and Atlantic Avenue in Camden.  Surveillance team members

observed MILLER exit Joseph's House in Camden, MILLER'S place of

employment, and enter his Chrysler 300.

125. On or about May 27, 2015 at approximately 4:48 p.m., law

enforcement intercepted a call from MILLER FACILITY 1 to (856)

993-4038 (PLUMMER).  During the call, MILLER told PLUMMER, "Yo,

we about to pull up to MISSY's, you there?," to which PLUMMER

responded, "Huh?"  MILLER then stated, "We about to pull up at

MISSY's." PLUMMER replied, "Alright, alright I'll get, I'll get ready to come there right now, I'm right here, I was on y'all side, I'm on my way over there." I believe that MILLER was on his way to 1220 Walnut Street to meet with PLUMMER to conduct the CDS transaction and/or unidentified item.

**126.** On or about May 27, 2015 at approximately 4:52 p.m., pole camera surveillance captured MILLER arriving at 1220 Walnut Street in his Chrysler 300. MILLER exited the Chrysler 300's driver's side and engaged in conversation with the driver of a white Cadillac bearing New Jersey registration D26-EXT (the "white Cadillac"). I believe that the driver of the white Cadillac was S.W., also known as "SHAWN," also known as "FAT BOY." At approximately 4:55 p.m., pole camera surveillance captured PLUMMER arriving at 1220 Walnut Street. PLUMMER was observed engaging in conversation with MILLER and S.W. A short time later, PLUMMER was observed entering the front passenger side of the white Cadillac. At approximately 4:57 p.m., pole camera surveillance captured MILLER departing the location in the Chrysler 300, at which time the white Cadillac remained parked in the area of 1220 Walnut Street. Surveillance team members then observed MILLER travel from 1220 Walnut Street to 206 Eutaw Street, Camden. Surveillance team members observed MILLER exit the driver's side of the Chrysler 300, approach a

group of unknown males sitting in the yard of 206 Eutaw Street and engage in conversation with the unknown males.

127. On or about May 27, 2015 at approximately 5:11 p.m., law enforcement intercepted a call from S.W. to MILLER FACILITY 1. During the call, S.W. told MILLER, "They right here, he was sitting right here, CUZ, waiting." MILLER responded, "Don't worry, I'm coming, I'm coming right back to you right now. I'll be there in two point two." I believe that S.W. placed a call to MILLER to inquire as to his whereabouts and what time he was returning to 1220 Walnut Street. Law enforcement further believes that when S.W. stated, "They right here, he was sitting right here, CUZ, waiting," that he was referring to an unknown male with whom PLUMMER was inside the white Cadillac waiting for MILLER to return to conduct the transaction. Pole camera surveillance captured the white Cadillac parked in the vicinity of 1220 Walnut Street at this time. I believe that S.W., PLUMMER and an unknown male were seated inside the white Cadillac awaiting MILLER'S return to conduct the CDS transaction and/or unknown item.

128. On or about May 27, 2015 at approximately 5:20 p.m., law enforcement intercepted a call from PLUMMER PHONE 1 to MILLER FACILITY 1. During the call, PLUMMER stated "Yo, CUZZO," to which MILLER responded, "Yo, where you at?" PLUMMER stated, "We right in front of MISSY's." MILLER then stated, "Oh alright,

I'm pulling up now."  I believe that PLUMMER placed a call to
MILLER to inquire as to when he would be returning to 1220
Walnut Street to conduct the CDS transaction and/or unidentified
item.

129. On or about May 27, 2015 at approximately 5:21 p.m., pole
camera surveillance captured MILLER arriving in the area of 1220
Walnut Street.  MILLER pulled up along the driver's side of the
white Cadillac and engaged in conversation with the driver,
suspected to be S.W.  At approximately 5:23 p.m., MILLER
departed the location.  At the same time, PLUMMER and an unknown
black male exited the white Cadillac and walked towards the
front porch of 1220 Walnut Street, at which time the white
Cadillac departed the area.  PLUMMER and the unknown black male
engaged in a conversation while standing in front of 1220 Walnut
Street for a short period of time.  At approximately 5:31 p.m.,
pole camera surveillance captured the unknown black male enter a
2004 Ford Pickup truck bearing Pennsylvania Registration ZGB-
4813 and depart the area.  A short time later, pole camera
surveillance captured PLUMMER depart 1220 Walnut Street in the
Durango.

130. On or about May 27, 2015 at approximately 5:53 p.m.,
physical surveillance was initiated in the area of Raritan
Street, Camden.  Surveillance team members observed PLUMMER,
operating the Durango, park behind the white Cadillac on the 500

96

block of Raritan Street.  I believe that S.W. was the operator of the white Cadillac.  I further believe that PLUMMER was going to meet with S.W. at S.W.'s residence at 561 Raritan Street. Surveillance team members observed PLUMMER exiting the Durango and entering the front door of 561 Raritan Street.  At approximately 6:35 p.m., surveillance team members observed PLUMMER and WISE depart the vicinity of Raritan Street. Surveillance team members observed WISE following PLUMMER's Durango in WISE's Pontiac.  WISE and PLUMMER were observed returning to the 500 block of Pfeiffer Street.  WISE was observed parking in the area of 536 Pfeiffer Street and PLUMMER continued to drive north on Pfeiffer Street through the Pfeiffer Street drug set, towards Baird Boulevard.

**131.** On or about May 29, 2015 at approximately 7:17 p.m., law enforcement intercepted a call from WALL FACILITY 2 to (856) 993-4038 (PLUMMER).  During the call WALL stated, "I'm trying to bust a move man.  I'm trying to make that Vegas trip though, but this shit ain't looking good for me."  WALL further explained, "I still pay the nigga this motherfucking money though.  That shit been blowing my shit man."  PLUMMER responded, "Hell yeah, I said it, it, it, you cool, I'm a, uh waiting for POP-POP or someone to call me and shit and, and, and, you know.  I got you," to which WALL responded "Yeah."  PLUMMER then stated, "I got I got rid of that the other way, you feel me?," to which

WALL responded, "Hell yeah."  Prior to the call disconnecting,
PLUMMER stated "I'm gonna come see you."  Based on the
investigation, I believe that WALL needed money to pay for a
trip to Las Vegas, and that he was asking PLUMMER for CDS to
sell on the Pfeiffer Street drug set.

132. On or about May 29, 2015, at approximately 8:39 p.m., law
enforcement intercepted a text from MILLER FACILITY 1 to
WILKERSON, that read, "U around."  WILKERSON responded with a
text that read, "Yeah."  At approximately 8:48 p.m., law
enforcement intercepted a call from MILLER FACILITY 1 to an
unidentified male.  During the call, MILLER told the
unidentified male, "Hey yo, I was gonna tell you. If you get a
chance man, go around the way and see DAVE, man."  The
unidentified male responded, "Around, uh, which way?"  MILLER
then stated, "Around my way," and "Go around there, holler at
DAVE, man.  You definitely want to get around there," to which
the unidentified male responded, "Alright, I got you."  I
believe that MILLER was coordinating a CDS transaction between
WILKERSON and the unidentified male.  After making sure that
WILKERSON was at the Pfeiffer Street drug set, MILLER
instructed the unidentified male to meet WILKERSON on the set,
which he and other DTO members and associates refer to as
"around the way."

133. On or about May 31, 2015 at approximately 6:26 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WISE FACILITY 1. During the call, MILLER asked WISE, "Are you around there," to which WISE responded, "No." MILLER then asked, "You don't know CRAIG's number, do you?" WISE responded, "Nah, I don't know his number. He was good. DAVE was there, too." At approximately 7:04 p.m., pole camera surveillance captured the Chrysler 300 pulling up on the Pfeiffer Street drug set and MILLER exiting the vehicle and walking toward 564 Pfeiffer Street. After a short time, MILLER walked back to the Chrysler 300 and departed. At approximately 7:23 p.m., pole camera surveillance captured the Chrysler 300 pull up on the 500 block of Pfeiffer Street again. MILLER again exited the vehicle, walked toward the sidewalk and conducted a hand-to-hand transaction with a male. I believe that MILLER was conducting a CDS transaction with the male.

134. On June 5, 2015 at approximately 2:02 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to PLUMMER FACILITY 1. During the call, an unidentified male told MILLER, "I'm chillin', yo BULL just hit me." MILLER responded, "Who that?" PLUMMER then stated, "Uh, [PLUMMER laughing], POP, but, but, but, I, I, I, I know you wanted to wait but we still, he still talking some crazy numbers." MILLER then stated, "Shit it's

cool, whatever you wanna do." PLUMMER told MILLER, "Nah, nah I, I, I, I, I, I, we, we, we, we, we need, we needed you for the discount right now, but if you want me to do, I'll do it, I'm on it, I don't give a fuck." MILLER then responded, "Go ahead." PLUMMER asked MILLER, "You want me to do it?," to which MILLER stated "Yeah, why not!" I believe that PLUMMER was calling MILLER to get MILLER's agreement as set owner to conduct an unknown CDS-related transaction. I further believe that PLUMMER was attempting to coordinate a CDS transaction with MILLER. I further believe that MILLER was authorizing PLUMMER to proceed with the CDS-related transaction without him.

135. On June 9, 2015 at approximately 6:37 p.m., law enforcement intercepted a call from PLUMMER FACILITY 1 to MILLER FACILITY 1. During the call, PLUMMER told MILLER, "I'm just gonna take two, man, 'cuz this nigga he fuckin' takin' all long. He, he ain't even fuckin' finish. He just getting ready finish the last, another five thousand of twenties." MILLER responded, "Nah, just tell him the shits there anyway, feel me?," to which PLUMMER replied, "Huh? Tell him three anyway?" MILLER responded, "Yeah." I believe that PLUMMER was talking about purchasing CDS; specifically, it is believed, based on the amount of money being discussed and my experience and that of other experienced narcotics investigators, that PLUMMER and MILLER were discussing purchasing two or three four-and-a-half-

ounce quantities of powder cocaine.  In law enforcement's
experience, four and a half ounces of cocaine is a typical
quantity purchased by drug traffickers to convert or "cook" into
crack cocaine, and typically costs approximately five thousand
dollars per four-and-a-half-ounce quantity.  Furthermore, I
believe based on the investigation, including other intercepted
calls, that MILLER and PLUMMER planned to purchase the three
four-and-a-half-ounces of cocaine with counterfeit money.

136. On June 9 2015 at approximately 7:20 p.m., law enforcement
intercepted a text message from MILLER FACILITY 1 to PLUMMER
FACILITY 1 that read, "You good."  At approximately 7:22 p.m.,
law enforcement intercepted a call from PLUMMER FACILITY 1 to
MILLER FACILITY 1.  During the call, PLUMMER told MILLER, "I'm
ready to go get what he got done, man," and "All good, we cool,
we in there, you know what I'm saying," to which MILLER
responded, "Yeah, that's cool."  I believe that PLUMMER was
telling MILLER that the deal was set up.

137. On June 9, 2015 at approximately 7:53 p.m., law enforcement
intercepted a call from PLUMMER FACILITY 1 to MILLER FACILITY 1.
During the call, PLUMMER told MILLER, "It ain't gonna be right
for the two, man.  I just told POP-POP, like yo man, it ain't
ready yet man, you feel me?  Like, I need some more time."
MILLER responded, "Oh, alright."  MILLER then stated, "Wait,
wait 'til it's right," to which PLUMMER responded, "In the

101

morning, BABY BOY have everything for me and I'll just get the three, you feel me? Don't, don't sell myself short." MILLER responded, "Yeah, that's cool," and "You can just wait until tomorrow, though." PLUMMER replied, "I'm a do it first thing in the morning because BABY BOY, he ain't, he, you feel me? I already know. Just to get another five, to get another five grand ready, he need like two hours, man." I believe that PLUMMER was telling MILLER that the deal was delayed to the morning of June 10th, 2015 because the counterfeit money was not ready. I also believe that PLUMMER had another source of counterfeit bills from whom he planned to obtain counterfeit currency to use to purchase the CDS.

138. On June 9, 2015 at approximately 8:33 p.m., law enforcement intercepted a call from PLUMMER FACILITY 1 to MILLER FACILITY 1. During the call, PLUMMER told MILLER, "He said, yo BOY, you think you going to be ready by eight, eight o'clock tomorrow? I'm like yeah, I'll be ready for the whole three, you know what I'm saying," to which MILLER responded, "Yeah." PLUMMER then told MILLER, "But look, I need, I need, I need, I need two fifty from you because I got this other nigger going to make the other five thousand for me, you know what I'm saying?," and "That way he, he making the five thousand and the other nigger gonna make the other five thousand." MILLER responded, "Yeah." PLUMMER then told MILLER, "I'll put it out. I'm just gonna need it

back," to which MILLER responded, "Yeah, It's cool, I got you."
I believe that PLUMMER was planning to purchase three four-and-
a-half-ounce quantities of cocaine using counterfeit currency at
8:00 a.m. on June 10th, 2015.  I also believe that PLUMMER was
asking MILLER to provide some real currency because some of the
cash needed to be real.

139. On June 10, 2015, at approximately 9:21 a.m., law
enforcement intercepted a call from a cellular telephone
investigation determined to be used by DTO associate A.J. to
MILLER FACILITY 1.  During the call, A.J. asked MILLER, "What's
up with BIG MAN?," and "He doing some funny shit, dog."  MILLER
responded, "No he ain't, man."  A.J. then explained "Yes, he did
dog.  He gave me fake ones."  MILLER then told A.J., "Come
through the job bro," to which A.J. responded, "Alright."  At
approximately 9:27 a.m., law enforcement intercepted a text from
the A.J. to MILLER FACILITY 1 that read, "Outside."  At
approximately 9:35 a.m., physical surveillance units observed a
gold-colored Infiniti, New Jersey registration N63-BYC, in the
parking lot of the Saint Joseph's Carpenter Society, located at
555 Atlantic Avenue, Camden, with an unknown individual in the
driver's seat.  At approximately 9:34 a.m., law enforcement
intercepted a call from MILLER FACILITY 1 to A.J.  During the
call, MILLER told A.J., "I'm coming out right now."  At
approximately 9:39 a.m., physical surveillance units observed

MILLER exit the Saint Joseph's Carpenter Society and enter the Infiniti. While MILLER was in the vehicle, law enforcement intercepted MILLER FACILITY 1 attempting to contact PLUMMER FACILITY 1 several times with no success. At approximately 9:46 a.m., physical surveillance units observed MILLER exit the Infiniti and enter the Saint Joseph's Carpenter Society. I believe that A.J. realized that the money used by PLUMMER to purchase the CDS was counterfeit and called MILLER to discuss the issue. I also believe that A.J. was the driver of the Infiniti. Once they were together, MILLER attempted to call PLUMMER to talk about the issue.

140. On June 10, 2015 at approximately 11:59 a.m., law enforcement intercepted a call from MILLER FACILITY 1 to PLUMMER FACILITY 1. During the call, PLUMMER asked MILLER, "That nigger calling your phone, ain't he?," to which MILLER responded, "He came to see me already." MILLER then stated, "I told him to give me that back. He gave it back to me," to which PLUMMER responded, "Oh, you did?" MILLER then stated, "Yeah, I said we gonna use it again," to which PLUMMER responded, "Yeah, you fucking right." Later in the call, PLUMMER told MILLER, "He should have gave my motherfuckin' real five hundred back," to which MILLER responded, "I know, he showed me that, too. It was four fifty." I believe that MILLER facilitated the CDS transaction between PLUMMER and A.J., and that PLUMMER used

counterfeit currency to purchase the CDS.  I also believe that A.J. gave the counterfeit currency back to MILLER when they met in the parking lot of the Saint Joseph's Carpenter Society.  I also believe that PLUMMER provided A.J. with an amount of real money that MILLER saw during his meeting with A.J.

141. On June 11, 2015 at approximately 11:22 a.m., law enforcement intercepted a call from MILLER FACILITY 1 to PLUMMER FACILITY 1.  During the call, MILLER told PLUMMER to meet him at the "towers" by the White Horse Pike in Collingswood, New Jersey.  I believe that MILLER was referring to The Heights of Collingswood Apartments, located at 700 Browning Road in Oaklyn, New Jersey and dispatched physical surveillance units to the area.  At approximately 11:43 a.m., law enforcement intercepted a call from MILLER FACILITY 1 to PLUMMER FACILITY 1.  During the call, PLUMMER told MILLER that he was at the location and that he was "facing the White Horse Pike."  At approximately 11:47 a.m., physical surveillance units observed a brown-colored Ford F-150 pick-up truck, Pennsylvania registration ZGZ-9052 (the "F-150"),[12] parked in a parking lot facing the White Horse Pike with an occupant in the driver's seat.  At approximately 11:51 a.m., MILLER was observed walking from his Chrysler 300 toward the F-

---

[12] During the course of this investigation, law enforcement surveillance observed PLUMMER operating a brown-colored Ford F-150 pick-up truck, Pennsylvania registration ZGZ-9052 (the "F-150").  Between June 11, 2015 and July 10, 2015, surveillance observed PLUMMER operating the F-150.  Rental agency records show that the F-150 was rented on June 10, 2015 and was scheduled to be returned on July 8, 2015.

150.   PLUMMER then exited the F-150 and conversed with MILLER outside the F-150.   PLUMMER was then observed entering the driver's seat of the F-150 and appeared to be showing something to MILLER.   MILLER was then observed leaning over PLUMMER appearing to try to get a better look at whatever was being shown to him by PLUMMER.   A short time later, PLUMMER exited the F-150 and began to converse with MILLER again.   At approximately 12:03 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to A.J.   During the call, MILLER told A.J., "I'm right here and shit with bro," and "know what I'm talking about, that little, that little situation got stuck with, ya know what I mean.   He's in a little hard spot right there."   MILLER then explained, "he saying like yeah, he gonna get it, he gonna get it to me, I'm gonna get it right to you, you feel me?"   Physical surveillance then observed MILLER hand the phone to PLUMMER.   As the intercepted call continued, PLUMMER told A.J., "Yeah, I'm gonna get that, I'm gonna get that, man.   I'm gonna get that to ah, CUZZO, man."   PLUMMER then said, "I'm definitely get, I'm gonna get every, I'm gonna get, as soon as, I'm gonna give it to him as it come in.   I ain't even gonna hold onto it.   As it come in, I'm gonna give it up so he can start giving it to you, you feel me?   I ain't gonna hold nothing, thousand, fifteen, whatever. I'm gonna give it all up."   During the call, physical surveillance observed MILLER on the phone, then handing the

phone to PLUMMER. I believe that MILLER and PLUMMER were meeting at the "towers" to discuss what they were going to say to A.J. about using counterfeit money to purchase CDS from him. Based on subsequent investigation later that day described below, I also believe that while they were together there, PLUMMER was showing MILLER the cocaine that they purchased from A.J. with the counterfeit money. I also believe that PLUMMER was telling A.J. that PLUMMER was going to give the proceeds of street-level CDS sales to MILLER, and that MILLER in turn would give A.J. that money to make good on the drug deal between A.J. and PLUMMER in which PLUMMER purchased cocaine from A.J. using counterfeit money.

**142.** On June 11, 2015 at approximately 2:43 p.m., pole camera surveillance captured the F-150 pull up at 1220 Walnut Street. An unidentified male and PLUMMER then exited the F-150 and entered WALL's residence at 1220 Walnut Street. After a few minutes, PLUMMER and the unidentified male exited the residence, entered the F-150 and departed. At approximately 3:33 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2. During the call, WALL asked MILLER, "Shit, trying to see what's up with that move?" MILLER responded, "They got with you already? SHEED and whatchacall did?," to which WALL responded, "Hell no." MILLER then told WALL, "I'm come through there right now." At approximately 3:43 p.m., pole camera

surveillance captured MILLER's Chrysler 300 park on the 500
block of Pfeiffer Street.  At approximately 3:46 p.m., law
enforcement intercepted a call from MILLER FACILITY 1 to WALL
FACILITY 2.  During the call, WALL asked MILLER "You outside?,"
to which MILLER responded, "Yeah."  Approximately a minute
later, pole camera surveillance observed WALL exit 536 Pfeiffer
Street and enter the Chrysler 300.  At approximately 3:47 p.m.,
as the Chrysler 300 was departing, law enforcement intercepted a
call from MILLER FACILITY 1 to PLUMMER FACILITY 1.  Prior to the
call connecting, MILLER could be heard in the background asking,
"You got money on you?," and WALL responding, "I got like twenty
dollars on me."  Once the call connected, PLUMMER told MILLER,
"I brung your bag, I put it in MISSY house over top of the
cabinet."  MILLER then told PLUMMER, "I got BOO with me anyway,"
then said, "Hold on, you tell him, tell him."  MILLER then
passed the phone to WALL.  PLUMMER then told WALL, "Hey yo, if
you go right into the kitchen, over top of the cabinets, all the
way in the box.  Right before the box, it's right there."  WALL
then asked, "Where?  Uh, Parkside?," to which PLUMMER responded,
"Yeah, I, I, I, got yours still.  I didn't put yours or nothing.
I got yours still," then said, "I just got cousin's shit."
PLUMMER then said, "Just give that to CUZZO," and "I got yours."
During the call, pole camera surveillance captured WILKERSON
approach MILLER's Chrysler 300, pull what appeared to be money

out of his pockets, count it and hand it inside the Chrysler 300, which departed following the transaction.  At approximately 4:10 p.m., pole camera surveillance captured the Chrysler 300 pull up beside 1220 Walnut Street.  WALL then exited the Chrysler 300 and entered the residence at 1220 Walnut Street.  A short time later, the Chrysler 300 departed.  GPS tracking information showed that the Chrysler 300 then traveled to the vicinity of 561 Raritan Street, which is an address associated with S.W.  I believe that PLUMMER left CDS inside 1220 Walnut Street, which he refers to as "MISSY's house," for MILLER, a.k.a. "CUZZO."  I also believe that WALL entered 1220 Walnut Street and picked up the CDS, which he gave to MILLER.  I also believe that MILLER and WALL took the CDS to S.W.'s residence, 561 Raritan Street, to prepare it for street-level distribution. I also believe that MILLER picked up proceeds of CDS sales from WALL and WILKERSON while on the Pfeiffer Street drug set.

**143.** On or about June 19, 2015 at approximately 10:26 p.m., law enforcement intercepted a call from MILLER FACILITY 1 to WALL FACILITY 2.  During the call, MILLER told WALL, "Tell them niggas they better be careful.  I just took ARTY around there. Boy, it's like 15 cars on A-T-L.  They got all them niggas laid down."  WALL responded "Awww, they ran down them?  Aww, man." After further explaining the number of police in the area, MILLER stated "So, so y'all better, you know what I mean, break

that crowd up.  Tell them niggas don't be chillin' on that curb cause they gonna," to which WALL responded, "Yeah, I know.  I'm ready to get the fuck home right now."  MILLER then stated "Yeah, they def got them niggas right now laid down," to which WALL responded, "Alright, I got them."  I believe that MILLER was referring to police activity in the area of Atlantic Avenue ("A-T-L") between Rose and Louis Streets.  I also believe that MILLER was telling WALL to inform set workers to be aware that police were in the area and to stay inside so that they would not be apprehended by law enforcement. MILLER's behavior is consistent with that of a set owner ensuring the set workers were not caught by law enforcement.

144. On or about June 25, 2015 at approximately 4:07 p.m., law enforcement intercepted a call between MILLER and WALL.  During this conversation, MILLER asked WALL, "you in the crib or you outside?"  WALL responded that he was "in the house."  MILLER then told WALL to "come out back real quick, I'm pulling up right now."  At approximately 4:09 p.m., the GPS tracker on the Chrysler 300 placed the vehicle behind the 2600 block of Berkley Street in Camden.  This is a residence previously identified by law enforcement as the current residence of WALL.  I believe that MILLER met WALL to transfer money and/ or illegal narcotics.

145. On or about June 25, 2015 at approximately 4:28 p.m., law
enforcement intercepted a call between MILLER and S.W.  During
this conversation, MILLER asked S.W. if S.W. felt like coming
outside because MILLER wanted to "holla" at S.W. "real quick."
The GPS tracker on the Chrysler 300 indicated that MILLER then
drove down the 500 block of Raritan Street in Camden.  As noted
previously, law enforcement has identified S.W.'s residence as
561 Raritan Street.

146. On or about June 29, 2015 at approximately 3:21 p.m. law
enforcement intercepted a call between MILLER and WALL.  During
this conversation, MILLER asked WALL, "What you doing nigga?
You need some time to get yourself together?  I need to come
holla at you."  MILLER also told WALL that he was "fucking with
LONGFEET, yeah, him and DAVE."  MILLER concluded by telling WALL
that he was coming to see him "right now."  I believe that this
conversation pertains to MILLER wanting to see WALL for the
purpose of transferring money and/or illegal narcotics between
MILLER and WALL.  At the time of this call, MILLER was on the
Pfeiffer Street drug set operating the Chrysler 300.
Approximately three minutes after this call, the Chrysler 300
travelled to the area behind the 2600 block of Berkley Street,
WALL's residence.

147. On or about June 30, 2015, MILLER exchanged multiple text
messages with (856) 426-8422 (an unknown subscriber) pertaining

to MILLER and the unknown subscriber meeting.  At approximately 9:56 p.m., MILLER texted the unknown subscriber, "I'm here." With the aid of the GPS tracker on the Chrysler 300, law enforcement surveillance was able to observe MILLER meeting with the male suspected of utilizing (856) 426-8422 shortly after this text message.  At approximately 10:29 p.m. on June 30, 2015, MILLER placed an outgoing call to R.R. and said, "open the door, yo."  At the same time this call was being made, MILLER and an unknown male (believed to be the same person MILLER met after exchanging the above-referenced text messages) were observed on pole camera surveillance entering an apartment believed by law enforcement to be utilized as a stash house/cook house for illegal narcotics at the Gramercy Apartments, Apt. M7, 2880 Hull Road, Camden.

**148.** On or about July 1, 2015 at approximately 8:40 a.m., MILLER placed an outgoing call to S.W.  During this call, MILLER could be heard in the background on an open line stating, "straight right?," and "is this the last one?"  This conversation is believed to pertain to MILLER picking up CDS from S.W.  At the time of this call, the GPS tracker on the Chrysler 300 reflected a location on the 500 block of Raritan Street.

**149.** On or about July 22, 2015, at approximately 9:23 p.m., law enforcement intercepted a call from WALL FACILITY 2 to PLUMMER FACILITY 1.  During the call, WALL asked, "What happen that um,

with that shit?  You ain't never get to it?," to which PLUMMER
responded, "Yeah pussy, I called your phone back.  You ain't
answer nigger."  PLUMMER then stated, "Well, if worse comes to
worse, I'm gonna see you tomorrow."  WALL responded, "Which ones
you talkin' about, though?  You got the, you got the, what you
got both of them?"  PLUMMER then responded, "Yeah."  I believe
that WALL was asking PLUMMER for CDS.  I also believe that that
when WALL asked for "both of them," he was asking if PLUMMER had
crack cocaine and heroin.

150. On Thursday, August 13, 2015 in the afternoon, the Camden
County Police Department arrested WISE in the vicinity of the
500 block of Pfeiffer Street for possession of a controlled
substance and possession of a controlled substance with intent
to distribute.  Subsequent to WISE's arrest, a search warrant
was executed on WISE's Pontiac.  During the search, Camden
County Police recovered thirteen small clear pink plastic bags
containing a white rock-like substance believed to be crack
cocaine.

151. This investigation is ongoing.  Premature disclosure of
this Application and Affidavit in support of Criminal Complaints
may compromise the investigation, which is neither public nor
known to the targets of the investigation, and its disclosure
may alert the targets to the ongoing investigation and may
seriously jeopardize the investigation, including by giving

targets an opportunity to flee from prosecution, destroy or
tamper with evidence, endanger their own lives or safety or that
of others, intimidate potential witnesses, change patterns of
behavior, or notify confederates, thus thwarting the
investigation.  Accordingly, it is respectfully requested that
this Application and Affidavit in support of Criminal Complaints
be sealed until further Order of the Court.

<u>CONCLUSION</u>

152. Wherefore, I submit that there is probable cause to believe
that the members of the conspiracy described above, from in or
about May 2014 and continuing through in or about August 2015,
in Camden County, in the District of New Jersey and elsewhere,
did knowingly and intentionally conspire and agree with each
other and others in violation of Title 21, United States Code,
Sections 846 to distribute and to possess with intent to
distribute:  1) 280 grams or more of a mixture and substance
containing a detectable amount of cocaine base, and 2) a
quantity of a mixture and substance containing a detectable
amount of heroin, contrary to Title 21, United States Code,

Sections 841(a)(1) and 841(b)(1)(A) and 841(b)(1)(C),

respectively.

_____
Michael Bailey, Special Agent
Federal Bureau of Investigation



SUBSCRIBED and SWORN before me
this _____ day of September, 2015

_____
HON. KAREN M. WILLIAMS
UNITED STATES MAGISTRATE JUDGE